FRENCH REPUBLIC et al. v. WORLD'S COLUMBIAN EXPOSITION.[1]

(Circuit Court, N. D. Illinois, N. D.     November 8, 1897.)

1. BAILMENT—WORLD'S FAIR.

The management of a world's fair, to which all nations are invited to send their choicest products, is charged with the duty of safeguarding the exhibits of foreign nations and their citizens with the highest intelligence and protection compatible with the ephemeral character of the Fair buildings. This obligation cannot be avoided by the promulgation of regulations that precautions would be taken for the safe preservation of all exhibits, but

---

[1] Reported by Louis Boisot, Jr., Esq., of the Chicago bar.

that the exposition company would not be liable for loss or damage, however occurring.

**2. SAME—EXTENT OF LIABILITY—NOTICE.**
The obligation to use such care continues after the close of the Fair until the exhibitors have had reasonable opportunity to remove their wares, and cannot be avoided by giving notice in advance denying liability for accidents.

**3. SAME—NEGLIGENCE.**
When a large exposition building has on its roof an extensive wooden sidewalk, and arrangements are made so that such sidewalk can be at once thoroughly soaked with water upon any danger of fire, it is negligence to allow such arrangements to be so neglected that the sidewalk cannot be soaked after the Fair has closed, but before the exhibitors have had a chance to remove their wares.

**4. SAME—CORPORATIONS.**
For such negligence, the local corporation which is charged with the duty of providing and preserving the physical side of the Fair, including the maintenance of the buildings, is responsible.

This was an action at law by the French republic and others against the World's Columbian Exposition.

William Burry, for plaintiffs.
Walker & Eddy, for defendant.

GROSSCUP, District Judge.    On the evening of the 8th of January, 1894, a little before 6 o'clock, a fire of incendiary origin broke out on the grounds occupied by the buildings of the World's Columbian Exposition.    When the fire department reached the scene, the fire had already taken hold of the Agricultural Building, the Casino Building, and was threatening the Peristyle and the Music Hall. All of these buildings, except the Agricultural Building, ultimately succumbed.    The exhibits installed by the plaintiffs were still on the main floor of the Manufactures Building, a little ways north of these burning buildings.    Immediately above them, on the main roof of the Manufactures Building, was a wooden walk, put there for promenading purposes, that entirely encompassed the central portion of the building.    Some time about 8 o'clock, the wind changing to the south, sparks and burning brands were carried from the burning buildings to the roof of the Manufactures Building, igniting these wooden walks. Burning planks and sticks from these fell down among the plaintiffs' exhibits, greatly damaging them, and immediately causing the injuries complained of.

Nearly all the buildings, including the Manufactures Building, put up by the defendant to house the exhibits of the World's Columbian Exposition, were constructed with framework of iron, and with inclosing walls of glass, and wood, covered by staff.    They thus presented an appearance of great solidity, but were, in fact, easily open to an ~ttack by fire at places where the staff had fallen off.    They were, ~ever, during the period of the Fair, kept in thoroughly good repair. ~h attention to repairs, however, was not the only precaution ~e management of the exposition to ward off the dangers of ~epartment of eight companies, six of which were organ- ~osition Company itself, was constantly upon the ~k extinguishers were placed plentifully throughout

all the buildings. Guards to the number of 1,200, were kept on constant watch. Nor was this all. The frequent displays of fireworks, with their attendant droppings of sparks and brands upon the adjacent buildings, and the possibility of fire in any building on the grounds, were a menace to everything not absolutely fireproof. In view of this, the Exposition Company had constructed in the Manufactures Building a standpipe leading to the wooden walk upon the roof, 264 feet from the ground, and connected with the water main under the floor. This pipe was kept full of water by means of Worthington pumps, the water at the top of the pipe having a constant pressure of about 60 pounds. By this arrangement there was kept constantly at hand, on a level with these wooden walks, a sufficient supply of water, under 60 pounds pressure, to keep them thoroughly soaked throughout any period of danger from fire. The device was effectively used whenever there were displays of fireworks, and was especially useful on the occasion of the burning of the Cold-Storage Building, when firebrands, almost as many and dangerous as on the evening of the 8th of January, were flying over the Exposition grounds.

Under the statute granting the use of Jackson Park, the Exposition Company was compelled to surrender the control of the grounds, except the inside of the buildings remaining, January 1, 1894. Accordingly, on that date, the grounds were thrown open. Nearly all the guards were withdrawn, and the six fire companies organized by the Exposition Company were disbanded, leaving only the city companies, the nearest of which was at the Sixty-Second street entrance, —more than one-half mile away from the group of buildings burned on the night of the 8th. Some Babcock fire extinguishers remained— perhaps 100—in the Manufactures Building. The Worthington pumps had been dismantled, thereby leaving the standpipe which led to the top of the Manufactures Building without water. The staff on the buildings was no longer kept in repair, and tramps and vagrants nested within their walls. A fire, under these circumstances,—a fire widely extended,—was not only probable, but almost certain. The Manufactures Building was kept closed, and under guard, and would unquestionably, on the night of the 8th, have escaped all dangers from its burning neighbors, if the wood walks on the roof of the building could have been protected by water soakings. The building suffered at no other point. The damage was caused solely by sparks and firebrands falling upon these wooden walks. The fire companies at hand did all, probably, that reasonable firemen, under the excitement of the contest, could have done to extinguish the flames, once they were started. The companies had abundant work with the other buildings, and even when they turned to the walks on the Manufactures Building had great difficulty in reaching their high altitude. Indeed, before they could effectually reach them, the walks had so far burned that the damage from the droppings was already caused. One thing alone could and would have saved the French exhibits, namely, the soaking of these walks with water, by means of the standpipe, from the moment the fire broke out in the other buildings. Had water stood in this pipe, under the pressure furnished by the Worthington pumps, or even under such pressure as could have been imparted by a fire

engine, the presence of two or three guards on the roof, distributing the water over the walks, would have prevented the ignition, and thus totally prevented the injury to the French exhibits. The failure of the defendant to keep up the previous precaution in this respect—a precaution carefully observed throughout the lifetime of the Fair—was the immediate cause of the plaintiffs' injuries.

What was the duty of the management of the Exposition in this respect? The president of the United States had invited the nations of the earth to take part in commemorating the discovery of America by bringing such exhibits to the Exposition as would fitly and fully illustrate their resources, their industries, and their progress in intelligence and civilization. Subsequently, the director general promulgated certain general regulations, in which it was announced that the Exposition would take precautions for the safe preservation of all objects in the Exposition, but would in no way be responsible for damage or loss of any kind, by accident or other cause, however originating. The chief of the department of foreign affairs, in connection with the director general, also issued a circular directed to foreign exhibitors, in which a like exemption from liability for loss was stated, but accompanied with a note announcing that a thoroughly equipped fire department would protect the buildings and the exhibits, and a large police force would maintain order.

The first question is, what effect is to be given to these immunity clauses? Were the Exposition a common carrier or a warehouseman, such an effort to exempt itself from liability would not, under the best line of adjudications, be extended to injuries resulting from its own positive negligence. Public policy forbids giving effect to stipulations against liability for injuries resulting from want of ordinary care. Cooley, Torts, § 685, and cases cited in note. The law will not permit a party to obtain pardon or immunity, even by contract, anterior to the doing of the culpable act. A policy so emasculated would deliberately encourage recklessness. The legal relationship between the Exposition and its exhibitors is not, of course, that of common carrier or warehouseman. No legal relationship, hitherto judicially defined, exactly applies to the parties now before the court. The proffer and acceptance of the exhibits constitute, unquestionably, some character of bailment; but the rules relating to bailments, such as the varying degrees of care required of bailees for hire, bailees for accommodation of bailor, and bailees for mutual advantage, do not, satisfactorily to one's sense of the fitness of things, exactly point out the law applicable to the case under consideration. The relation is in many respects different in character, and in the just expectations entertained by mankind, from the ordinary private transactions that constitute the usual bailment. The Exposition was itself no ordinary event. It was intended to bring together the nations of the earth, that they might set forth, within a space compassable by ordinary human understanding, all that the industry, the fertility, and the genius of the globe has produced. It was a minature re-enactment, in a single park, of all the best things doing around the girdle of the earth. It was the summing up in panorama of the history of mankind in every field of useful endeavor up to the present time. It was

intended to bring into one collection the best things ever conceived by the mind, and the best things ever made by the hands of man. The exhibits were expected to be the prime choice of every exhibitor's product. They represented the best he could do. Many of them were unique, and could, by no effort, be replaced. Their loss would, in many instances, be a calamity, not only to the owner, but to commanding interests of the world at large. The exhibits of the French republic were especially unique. This republic, in aid of the useful arts, conducts governmental factories, in which are made, at no consideration of time or cost, examples of some of the finest tapestries, vases, and other things that minister to the wants of civilization. These factories are, in fact, national schools, in which the French artist and artisan finds the means both of instruction and encouragement. The products brought forth are each a text-book,—a text-book of which but one copy is extant. Their loss is irreparable; for it is the loss, not so much of a mere manufactured article as of the text and equipment wherewith the republic teaches her people how to reach fine results in a high and useful field. It is manifest that of the custodian of such a collection much is expected, and rightly expected. Nothing short of exhaustive carefulness, all the circumstances considered, can fully meet the moral and legal obligations imposed. The widest character of public policy—the progressive interests of mankind—re-enforces the rightfulness of this view. These expositions are not merely the world's play grounds or amusement parks. They are schools. They touch deeply the sensibilities of every people who come within their influence, and are among the powerful factors that give direction to national and individual character and civilization. As long as men and women learn more by example than by precept, the atmosphere of better living is chiefly striven for by those who have felt and seen what better living is. An exhibition of the world's best things brings this higher atmosphere into every life it touches. They are not only a distinct civilizing force among the people where held; they are equally potent and useful as a force making for peace and good understanding between the peoples of the earth. In every aspect seen, they merit public and national encouragement, and chiefly that encouragement that arises from confidence that their management will be held to strict accountability for any omission that brings insecurity either to the persons or exhibits in attendance. If exhibitions of this character bear a tithe of the good fruits that the common consent of mankind now attributes to them, the agencies in control should be so hedged around by salutary restrictions and responsibilities as would properly insure to the exhibitors, individual or national, security against loss. The good faith of the nation within which such an exhibition is held cannot be fulfilled under conditions less imperative. I hold, therefore, as the law of this case, that the management of the Exposition was under legal obligations to safeguard, by the highest intelligence and protection compatible with the ephemeral character of the buildings, the exhibits of the plaintiffs, the French republic and the French citizens, and that such obligation is not escaped by the exempting clauses contained in the regulations promulgated by the director general.

83 F.—8

The next inquiry is, was such diligence observed in the particular matter causing the injuries? Was the Exposition bound to maintain on the 8th of January the practical fireproofing of the wooden walks, so effectually maintained during the Fair? It must be borne in mind that the arrangement to soak these walks was not so much in the nature of fire-extinguishing as of fire-proofing. Facilities for extinguishing the fire assume that ignition will take place; facilities for fireproofing look towards the prevention of ignition altogether. The first is a cure; the second is a prevention. In this, as in other regulations, a spray of prevention is worth a flood of cure. The removal of the Worthington pumps without the substitution of a fire engine, or some equivalent, whereby water was obtainable on the roof of the Manufactures Building the moment any spark or firebrand was liable to fall upon the wooden walks was, in effect, the taking away from this building of its fireproofing. It uncovered the building to an attack of fire, as effectually as would the removal of iron sheeting, had the wooden walks been previously fireproofed by means of such sheeting. With water present under pressure at the roof line, these walks were as uninflammable as steel; without such water, they were as inflammable as kindling wood. Had the water pressure been removed during the period of the Fair, and a fire, such as the one in question ensued, the liability could not, I think, be disputed. If, after the Fair, and until the occasion of this fire, the liability of the Exposition to these plaintiffs continued as before, the case is still more pressing; for after the Fair the dangers were, by the circumstances I have recited, greatly increased.

This brings me to the next question: Did the duty of fireproofing this building, as a protection to these plaintiffs, continue to the 8th of January, 1894? The answer to this question resides in the effect to be given to two sets of facts submitted in the evidence. The rules and regulations promulgated by the director general and the custom officers made it the duty of foreign exhibitors to deliver the original cases, upon the unpacking of their exhibits for installation, properly marked by serial numbers, to a bonded warehouse of the Exposition, with the view of repacking such exhibits, at the close of the Exposition, in their original cases. A bonded warehouse within the inclosure of the park was provided by the Exposition Company for that purpose, and the plaintiffs, along with other exhibitors, delivered to this warehouse the empty cases, taking receipts therefor. There is no doubt that at the close of the Fair there was considerable confusion in this warehouse, and that the plaintiffs were much delayed in receiving their boxes. Indeed, it is perfectly clear that many boxes were never returned, and that the French wares, some of which were injured in the fire, were packed in boxes especially built by carpenters hired for that purpose. The records of the custodian in charge of the warehouse indicate that no boxes were delivered to the French exhibitors after the 16th of December. But testimony, which I am compelled to believe, shows that as late as January the French exhibitors were still engaged in repacking in new cases made especially for that purpose. I am satisfied that through some miscarriage of this feature of the Exposition's arrangement, the plaintiffs

were so delayed that, all other things being at hand, they could not have been off before, or at least many days before, the 1st of January. But all other things were not at hand. The evidence is indisputable that, even had the cases been provided, and the exhibits packed, there were not cars enough furnished by the transportation companies to carry off these exhibits before the fire. Day after day individual exhibitors, in their desperation, stole cars that had been intended for others. The week ending January 6, 1894, witnessed the forwarding of 325 car loads from the Exposition grounds; almost as many as left the grounds during any week previously. The week ending January 20th—12 days after the fire—witnessed the forwarding from the grounds of 402 car loads of exhibits; the largest exodus, with one exception, during the whole period after the close of the Fair. Indeed, as late as February 17th 131 car loads went out in a single week. When one recalls the condition of things, after January 1st, in the park,—its openness to the public, the withdrawal of the guards, the inability to heat the buildings, the frequency of fires, and the complete withdrawal of public interest,—this procession of cars, extending almost to the opening of spring, attests beyond dispute the inability of the exhibitors to get their goods out earlier. They were compelled to remain simply because they could not get away. The Exposition Company it is true, was under no obligation, either of law or of contract, to furnish cars. But it still had control of the buildings, and was, in virtue of that fact, yet in custody of the exhibits. The obligation to safeguard the exhibitors did not necessarily end the day the Fair closed. The obligation unquestionably continued until the exhibitors could reasonably withdraw their goods. An ordinary warehouseman cannot end his duty or escape liability for affirmative negligence simply by giving notice to the owner to withdraw his goods, even though the owner have power to comply with the notice. As long as the goods remain, within at least reasonable limits the obligation to preserve continues. The agencies of a great national exposition, executing the good faith of a nation towards those who have placed their possessions within their custody, is under a no less strenuous obligation. Private justice and public faith both forbid, at least within reasonable limits, the withdrawal of protection so long as the exhibitors are helpless from any cause not of their own creation.

I hold that the Exposition was under legal obligation to maintain some arrangement by which the wooden walks at the top of the Manufactures Building would be effectually fireproofed until these plaintiffs, under all the circumstances of the situation, had had a reasonable time to take out their exhibits. I hold also, that in the conditions relating to the boxing of the exhibits, and their transportation from the grounds, the plaintiffs had had, before the 8th of January, when the fire occurred, no reasonable opportunity to withdraw their exhibits. It follows from all these facts that the management of the Exposition was guilty of negligence in permitting, during the period in which the fire occurred, the fireproofing arrangements to lapse, and that this negligence is the immediate cause of the injury from which the plaintiffs have suffered.

One question alone remains: Is the defendant, the Illinois corporation, the particular branch or agency of the Exposition upon which that duty was charged? There has been much difference of opinion respecting the relation borne respectively by the government, by the national commission, and by the local corporation to the affairs of the Exposition. I think there is, however, throughout the diversity of opinion upon the general question, this agreement of views: that the local corporation was under duty to provide and maintain the physical side of the Exposition, including the preparation of the grounds, the erection of the buildings, their maintenance, protection, etc. Whether the government, as a nation, inaugurated and controlled the Exposition, the local corporation being merely its arm to carry out the enterprise, or whether the local corporation was an independent entity, accepting aid from and co-working with the government and its commission, is, in its bearing upon the question under discussion, a matter of indifference. In either view, the local corporation was under direct obligation to safely house the exhibits during the period of the Exposition, and for such time thereafter as was reasonably required for their removal. Its failure to perform this duty in the respect pointed out creates a direct legal liability to the exhibitors injured. On the whole case, there must be a finding for the plaintiffs.