## THE BARNSTABLE.

### HALL et al. v. THE BARNSTABLE.

### TURRET STEAM SHIPPING CO., Limited, v. BOSTON FRUIT CO.

(District Court, D. Massachusetts. January 25, 1898.)

#### No. 760.

**1. SHIPPING—CHARTER PARTIES—RISK OF COLLISION—LIENS.**
In the absence of more definite provisions, a declaration in the charter party that the owner "shall pay for the insurance on the vessel" casts on him, as between owner and charterers, the risk of a collision lien becoming attached to her through her negligent navigation, though her master, officers, and crew are appointed by the charterers, and they are vested with complete possession, so that her navigation is their business.

**2. SAME—PUBLIC POLICY.**
Public policy does not forbid the owner from contracting with the charterer to be liable for damages to other vessels caused by negligent navigation of the chartered ship, while in charge of a master and crew appointed and controlled by the charterer.

**3. PAROL EVIDENCE—CHARTER PARTY.**
Parol evidence by an experienced broker, who negotiated a charter containing a provision that the owner should "pay all insurance on the vessel," that he told the owner he was liable for insurance of all kinds, including insurance against collisions, unless he wanted to take the risk and not insure, is admissible to explain the intentions of the parties.

This was a libel in rem by A. G. Hall and others against the steamship Barnstable to recover damages resulting from a collision. The

Turret Steam Shipping Company, Limited, claimant and owner of the Barnstable, filed a petition against the Boston Fruit Company, her charterer, to enforce an alleged ultimate liability of the latter, on the ground that it was responsible for the ship's navigation.

Carver & Blodgett, for libelants.
Convers & Kirlin, for the Barnstable.
Russell & Russell, for Boston Fruit Co.

BROWN, District Judge. In the controversy between the owner and charterer it is assumed that the Barnstable is liable in rem for a total loss of the fishing schooner Fortuna in a collision caused by the fault of those in charge of the navigation of the Barnstable. It is agreed that the master, officers, engineers, firemen, and crew of the steamer had been appointed by the charterer, and were paid by the charterer pursuant to the charter party. It is also agreed that "the collision was caused by the negligence of master, mates, or crew at the time in charge of the navigation of the steamship." The result sought by the owner is thus stated upon the brief supporting the petition upon which the charterer has been cited in by the owner:

"A decree should be entered for the libelants against the Barnstable and the Boston Fruit Company [the charterer] for the damages sustained; but the decree should provide that the damages be collected in the first instance from the charterer, and that only the amount not so collectible be paid by the ship; and the decree should further provide for a recovery over against the charterer, in favor of the shipowner, of any amount it may have to pay; and the shipowner should recover costs."

Without dwelling upon the grounds for doubting the right of the owner, who has appeared as claimant in a proceeding in rem, to proceed by petition against the charterer in this, a cause of collision, and merely recording a doubt of the propriety of the practice, in view of admiralty rule 15, and of the express limitation of rule 59, we will examine only those questions that have been argued.

I am of the opinion that the owner has satisfactorily sustained its contention that the charter party vested the possession, command, and control of the vessel in the Boston Fruit Company and its servants, and that the navigation of the vessel was the charterer's business. The main question, therefore, is, were the relations between the owner and the charterer such as to impose upon the charterer the obligation to indemnify the owner, in case the vessel, as the instrument of damage, should be subjected to a lien through the negligence of those appointed by the charterer to manage her navigation? The owner contends that this right to indemnity rests upon the general principles of the law of bailments. The case of Bouker v. Smith, 40 Fed. 839, and Id., 1 C. C. A. 481, 49 Fed. 954, is cited in support of the proposition that a charterer of a hired ship must pay for its loss through his fault. This rule, it is argued, must also require the charterer to pay for its damage received by collision, and if the collision, instead of injuring the hired vessel, gives rise to a lien upon her for damage to another vessel, the charterer must logically be bound to discharge the lien; that the rule requiring the return of the vessel undamaged must

also require its return without impairment to or lien upon the title. The Alert, 40 Fed. 836; The Centurion, 57 Fed. 412.

The charterer denies its liability to indemnify the owner, contending that the general principles of the law of bailments are inapplicable, since by the charter party the owner and charterer have entered into special contractual relations, which preclude the owner from calling upon the charterer for indemnity for risks, and which cast the loss ultimately upon the owner. No case has been cited as a precedent, and the lack of legal precedents, considered in connection with the testimony of witnesses of long experience that a claim like the present, by an owner against a charterer, is unknown in the shipping business, raises an inquiry whether the hazards to which vessels are exposed, and the peculiar law that renders the vessel liable, regardless of ownership or control, have not led owners and charterers to a different usage from that prevailing in the hiring of chattels not by their nature exposed to special hazards, and not the subject of liens imposed by the hirer and valid against the owner. If the rules in ordinary bailments have been considered by owners and charterers practical rules applicable to their business, it is remarkable that no instance can be cited in which they have been practically applied. The parties are presumed to contract with reference to existing rules of law and known usages, and, in my opinion, we are required, in order to arrive at a proper construction of the charter party, to give weight to those elements that do not exist in ordinary bailments.

In the case of French Republic v. World's Columbian Exposition, 83 Fed. 109, it was said:

"The rules relating to bailments, such as the varying degrees of care required of bailees for hire, bailees for accommodation of bailor, and bailees for mutual advantage, do not, satisfactorily to one's sense of the fitness of things, exactly point out the law applicable to the case under consideration. The relation is in many respects different in character, and in the just expectations entertained by mankind, from the ordinary private transactions that constitute the usual bailment."

The presumption that a hired chattel will be restored uninjured, and without impairment to the value of the title, forms a part of the understanding of the parties in ordinary bailments. If a like presumption of fact exist in an ordinary case of hiring a vessel, it must be weaker in the degree that the just expectation of loss is stronger. The weaker the presumption of a safe return, the greater the risk that was in the contemplation of the parties at the time of contracting, the stronger the inference that the contract is affected in all its provisions by the risk, and that it provides therefor.

As to the special risk in question, the owner contends that the contract is silent. The charterer contends that the contract speaks expressly. Bearing in mind the importance of the question of risk of loss, and the fact that nowhere does the contract provide in terms that the owner shall be indemnified by the charterer, or relieved from the risk of loss to which merely by the relation of owner he is exposed, and seeking for direct expressions of the intention of the parties as it existed at the time of contracting, we find the stipulation. "(22) *The owner shall pay for the insurance on the vessel.*" Insurance has

been described as "a fixed sum as the price of risk." The parties were contracting with express reference to risks capable of estimate in money. In construing the charter party, we should not be confused by the fact that a large loss has occurred. What is now a loss was at the time of contracting merely a risk,—the risk (as a commercial consideration) a mere money charge. This express assumption by the owner of the cost of indemnity I regard as a most unequivocal expression of an intention to assume, and to relieve the charterer from, all risks that would be covered by "the insurance on the vessel," for which the owner was to pay. Upon the opposite view, an owner who, for a valuable consideration, has agreed to bear the cost of indemnity, may throw that cost upon the charterer, provided the risk existing at the execution of the contract subsequently matures into loss. This is entirely inconsistent with the owner's contention that this clause, commonly employed in charters of various kinds, is used in accordance with a common scheme of dividing the "fixed charges" between the owner and charterer.

If, as argued upon the petitioner's brief, insurance is to be regarded as a fixed charge appertaining to the vessel, according to a general practice to have vessels insured, and there is a general scheme to distribute the fixed charges, the owner assuming some, the charterer others, then it must follow that both should share in all benefits accruing from the payment of the fixed charges upon the vessel. Counsel for the owner contends that the fundamental fallacy in the respondent's argument lies in the assumption that, because the charter shows that the owner wants insurance against his own risks, he also means to insure the charterer's risks, and to assume them. In reply to this criticism, it may be said that the owner's argument involves the fallacy of a shifting of premises, and of treating the insurance—First, as relating to the vessel, and to the joint enterprise of owner and charterer; and, secondly, as relating merely to the respective individual risks of owner and charterer; and that the argument involves also an assumption that the risk of a lien upon the vessel, as an offending res, is not an owner's risk, that should be insured against by the owner through a policy that might be described as "insurance on the vessel." The fact that a charterer may be liable in personam to third persons does not change the owner's risk that one injured may elect to proceed in rem.

As a guide to construction, I adopt the view suggested by the counsel for the owner, that the parties, in forming their contract, regarded themselves as embarking in a joint enterprise, to which, for their joint benefit, certain sums must be contributed for fixed charges or necessary expenses. These expenses were necessarily incurred, that the ship might work to the profit of both owner and charterer. Among these fixed charges was "insurance on the vessel." The owner's brief, and the evidence of a general usage to insure, lead to this view. The assumption of any one of the fixed charges by either party is an agreement to relieve the other of that expense, and not to call upon him to pay that charge. The agreement of the owner "to pay for the insurance upon the vessel" is an express agreement to assume, and not to

call upon the charterer to pay, this expense. "To pay for the insurance upon the vessel" is to pay a sum for a purpose,—to reduce an indefinite risk of future loss to a mere present definite expense. The owner, therefore, contracts upon the basis of a known and definite expense. The price which the charterer pays the owner is full consideration for the expense assumed by the owner for insurance as well as for the use of the vessel. This is the legal effect of the charter party. In substance, therefore, the contract price paid by the charterer includes full repayment to the owner of the price of insurance. As the charterer in this way has already borne the expense of insuring the vessel, has paid to the owner the price of risk, or cost of indemnity, according to the terms of the contract, the owner cannot call upon the charterer to pay it again. Especially would it be a violation of clear intention to compel the charterer to pay the cost of indemnity when, through actual loss, that cost has become greatest. The charterer having contracted on the basis of risk, and having satisfied the owner for his risk by a money payment, has, so far as the owner is concerned, stopped the running of the risk against himself. If the owner has observed the terms of his agreement, he has obtained, by the consideration that the charterer has paid him, his indemnity against loss. The charterer has paid him what the contract makes the equivalent of the present loss. Upon every legal and equitable consideration, therefore, the charterer is relieved.

The remaining question is, what is included in the phrase "insurance on the vessel"? The phrase seems broad enough to include insurance of every kind that, in the expectation of the parties, properly appertained to their joint enterprise. Upon the owner's brief it is claimed:

"If the fruit company intended that the insurance clause should have the effect of giving it the benefit of the owner's insurance, presumably it would have adopted the following or an equivalent form of words: 'The owners * * * shall pay for the insurance on the vessel against all risks, including protection and indemnity and freight and demurrage club protection, giving charterers full benefit of same as if they were for the time being owners of the ship.' "

This, a form in practical use, is itself an example of the use of the term "the insurance on the vessel," as comprehending risks of every character, since the subsequent part of the sentence is a mere specification of what is comprehended in the previous general language. There is also testimony from the claimant's witness Gourlie tending to show that such a clause would ordinarily be held to include three-quarters of a collision risk, including running down.

Furthermore, it has been proved by the charterer, and is not disputed, that the actual understanding of the owner, at the execution of the contract, was that the phrase included insurance against risks of all kinds. William H. Bennett, who as broker negotiated the charter for the owner and charterer, testifies as follows:

"I have had a good deal of experience in various insurance claims; * * * so much so that I clearly expressed to the owner that he would have to pay for all insurance on the vessel, in any way, shape, and manner, against stranding, collisions, and everything, as is usually done in all vessels, unless he wanted to take the risk, and not insure."

The owner objects, on the ground that this evidence is incompetent. In my opinion, however, the evidence was admissible. It did not vary, add to, or contradict the writing, but only interpreted and made certain its terms. Lonergan v. Buford, 148 U. S. 581, 588, 13 Sup. Ct. 684. "If the language of the document, though plain in itself, applies equally well to more objects than one, evidence may be given both of the circumstances of the case, and of statements made by any party to the document, as to his intentions in reference to the matter to which the document relates." 7 Am. & Eng. Enc. Law, 93.

Many other provisions of the contract have been urged by counsel for the charterer in proof of the owner's intention to assume the insurable risks pertaining to the vessel. That the owner assumed the risk of damage to his vessel, and could not call upon the charterer to repair her or indemnify him for such loss, is very clear. There are express agreements that lead to this conclusion, without recourse to the provision concerning insurance. He is to maintain her in a state of repair, and the hire is to abate during time lost by collision.

There is great force in the argument that, since the vessel if damaged by this collision would have immediately been at the expense of the owner for repairs, with an abatement of price during the time lost in repairs, the parties contemplated faults in navigation, and that there was a general intent to assume the risk of all consequences of collision, and no intent to make a distinction between receiving and inflicting damage. It is clear upon the face of the charter party that the owner assumed one consequence of a collision caused by the fault of the charterer's servants, and agreed to bear the expense of insuring against it; and it is fair to infer that he also contemplated the other consequence of the same fault as a proper subject for insurance. As the whole risk was insurable, evidence of a custom to insure only three-quarters does not, in my opinion, affect materially the question of intention. In considering this question, I do not lose sight of the doctrine of the case of Insurance Co. v. Sherwood, 14 How. 364, cited upon the owner's brief. Though the loss in the present case was the result of a collision, with the added element of the negligence of the charterer's servants, yet the owner was liable to loss from such causes, and could insure against it. As the contracting parties both understood that the vessel was to be under the charge of a master, who, though appointed by the charterer, was to be satisfactory to the owner; as the possible liability of the charterer to third persons for the master's fault would rest, not upon the charterer's personal fault, but merely upon an imputed responsibility; as the charterer's and owner's business both required that the vessel should be set in motion, and thereby become exposed to the danger of a lien as an offending res,— I see no reason, arising from public policy, why the owner and charterer should not agree between themselves as to which should bear the expense of indemnity against such an anticipated loss. When the joint business of two persons requires the agency of a third, who is to have a large sphere of independent action not under the personal supervision of either, I see no reason why they should not, in fixing the terms of their agreement, contemplate that this third person,

through negligence, might cause a loss; estimate the risk at the cost of insuring against it, and fix the contract price accordingly. It is conclusively settled in this country and in England that a policy of insurance, taken out by the owner of a ship or goods, covers a loss by perils of the sea or the perils insured against, although occasioned by the negligence of the master or crew, or other persons employed by himself. Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 312–323, 6 Sup. Ct. 750, 1176; Insurance Co. v. Adams, 123 U. S. 67, 72, 8 Sup. Ct. 68; Liverpool & G. W. Steam Co. v. Phœnix Ins. Co., 129 U. S. 397, 438, 9 Sup. Ct. 469; California Ins. Co. v. Union Compress Co., 133 U. S. 387, 415, 10 Sup. Ct. 365. If indemnity insurance is lawful and proper, there should arise, in construing the charter party, no presumption that the parties did not intend it.

In Insurance Co. v. Adams, 123 U. S. 67, 72, 8 Sup. Ct. 68, the court quotes Insurance Co. v. Insley, 7 Pa. St. 223, 230:

"Public policy requires no more than that a man be not suffered to insure against his own knavery, which is not to be protected or encouraged by any means; for though the maxim, 'respondeat superior,' is applicable to the responsibility of a master for the acts of his servants, yet the insured, so long as he acts with fidelity, is answerable neither for his servants nor for himself."

These principles are equally applicable in construing the contract between the owner and charterer. As in this country liability attaches by law to the vessel as an offending res, regardless of the relations of the owner and those in control, it is natural that the parties should consider the vessel as so liable, and contract on that basis.

From the language of the charter party, and from the evidence that the phrase "insurance on the vessel" was used with an actual intention to cover what, according to its literal terms, it was capable of covering,—running down risks as well as risks of direct injury,—I am satisfied that the intention of the parties was that the owner should bear the risks of that primary liability to which his relation as owner exposed him, and that, according to the legal effect of the charter party, he has received compensation for his risk from the charterer. Having received full compensation for risks, he has likewise received full compensation for all that, at the time of contracting, was potentially within the risk for which he has been paid.

The petition of the Turret Steam Shipping Company, Limited, against the Boston Fruit Company, is therefore dismissed, with costs. Upon the main case, a decree may be entered for the libelants against the vessel for the sum of $19,475, with interest from January 1, 1897, and for their costs.