BLAKESLEE et al. v. NEW YORK CENT. & H. R. R. CO.

(Circuit Court of Appeals, Second Circuit. June 23, 1905.)

No. 206.

SHIPPING—INJURY OF BARGE AT WHARF—LIABILITY OF CHARTERER.

Evidence considered, and *held* insufficient to establish the claim of libelant that an injury to his barge, which was under charter to respondent, and was damaged by being struck by some moving vessel while at its docks, was caused by one of respondent's tugs; there being no direct credible testimony to identify the vessel causing the injury, which occurred in the night.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal to review a decree of the District Court, Southern District of New York, holding the respondent liable for damages sustained by the barge Katie (owned by Blakeslee) and her captain, Gunderson, who lost his personal effects when she sank in consequence of injuries sustained during the night of January 27–28, 1903. The decision in the District Court is reported in 132 Fed. 153.

F. M. Brown, for appellant.
La Roy S. Gove, for appellees.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. The Katie was old and somewhat weak, but she had just been repaired, and we concur in the finding of the district judge that her condition was fairly good, and sufficient to encounter the ordinary contacts of harbor towage. The injuries she sustained warranted the conclusion that she had been subjected to an unusually severe blow. On January 27th, about 6 p. m., or a little after, the barge was taken in tow at Atlantic Basin, Brooklyn, by respondent's tug No. 13. She was then in sound condition. On January 28th, after 11 a. m., she was taken in tow at West Shore Docks, Weehawken, by respondent's tug No. 12. At that time her stem was knocked to one side, and there was a hole in her bow above the water line. It is conceded that no tugs other than respondent's moved her from place to place in the interim. She was under charter to respondent, and used only in its service, but that circumstance is not sufficient to establish the liability of respondent, which was not an insurer. There must be some evidence warranting a finding of negligence in her care or management. Undoubtedly the Katie received a severe blow that night from something, floating or stationary, and the only witness who testifies to the circumstances under which that blow was received is the co-libelant, Gunderson, who was on board of her all the time. All of his testimony was taken by deposition. So we are not embarrassed in weighing it by the conclusions of the district judge, who neither saw nor heard him. His statements as to the events of the night are so discordant that it is charitable to assume he was at the time

in such a mental condition as to confuse his observation, and make his recollections less persuasive than they would otherwise be. On January 29th, the day after the accident, he signed a protest, in which he stated that the barge arrived at West Shore Docks about 10 p. m. on January 27th; that during the night, around 1 o'clock, a New York Central tug shifted her to the next pier to load freight; that before he had time to get on deck the barge received a very heavy blow; that either the tug ran into the barge herself, or she ran into another barge; that when he came on deck he asked the tugman what they were trying to do with the barge, but received no satisfaction; that it was too dark to ascertain the damage received; that between 3 and 4 a. m. a cargo of shooks was loaded on her, and about 7 a. m. he found she was making water; that about 11 a. m. the tug came to tow him to destination, at Pier 16, East river, but when off Pier 4, East river, the water gained so fast, cargo was taken into another boat, and she was taken to Stanton street, sinking just off the dry dock there.

The libel (filed July 8, 1903) averred that during the night a tugboat operated by respondent came into the slip of the West Shore Railroad at Weehawken, the barge Katie at the time lying on the north side of said slip, with her bow pointing in, and stern out (therefore with her starboard side to the pier), said tug having called to take the said boat (Katie) in tow, but that the tug was so carelessly managed and navigated that she struck the stem of the barge a very violent blow, doing serious damage; that said tug (the one that did the damage) thereupon took said barge in tow, and towed her to the foot of Thirty-Third street, North river (a dock belonging to respondent), where, after being landed, said barge commenced to leak; and that subsequently she was taken to Pier 4, East river, and thence to Stanton street. The protest, as put in evidence, has no jurat, and the libel was verified by the co-libelant, Blakeslee, but inasmuch as no one but Gunderson is indicated as having at any time given any narrative of what happened at 1 or 2 a. m., there can be little doubt that both the documents embody statements as to the events made by him.

Testifying upon deposition (November 10, 1903), Gunderson gave the following account of the occurrences of the night: The Katie was taken in tow at Atlantic Basin by one of respondent's tugs at about 6:30 p. m., and towed to a pier at Thirty-Ninth street, which does not belong to respondent, where she arrived about 10 p. m., and was made fast, close to the bulkhead. Thereupon he went to bed, or, rather, turned in with his clothes on, and was awakened after midnight by a severe shock. Getting up, he found himself at the West Shore Pier in Weehawken, with a tug alongside on his port side, the Katie's starboard side next the dock, and a deck hand from the tug making her fast. This time he fixes as between 1 and 2 a. m. The barge had struck against the dock with such violence that a lamp and other things in his cabin were knocked over. There was an exchange of remarks between the deck hand and himself. He did not discover the damage then, but at 7 a. m. he found that the Katie's stem was knocked from the starboard clean over to the

port side, and that she was leaking. Subsequently, about 11 a. m., they started to tow her to Pier 16, East river, but went first to Pier 4, East river, and then to Stanton street, where she sank. The witness may have been confused as to which was the respondent's New York pier, Thirty-Ninth or Thirty-Third street or Thirty-Second street (both the latter belonging to respondent), but on direct and cross examination he stoutly adhered to his story that he was first made fast (about 10 p. m.) to the New York pier, whichever it was —he describes his berth there relatively to surrounding objects quite particularly—and remained there some hours before he was removed to the West Shore Pier. He asserted with equal positiveness that the tug which brought him across the river did not herself run into the Katie, being lashed to her port side, but drove her violently into the pier, thus knocking her stem to port. Upon the trial, after Gunderson's deposition was put in, the libel was amended so as to charge that the respondent first towed the Katie from Atlantic Basin to the New York Central Dock at foot of Thirty-Ninth street (it may fairly be assumed that Thirty-Third street or Thirty-Second street is meant), and that during the same night one of respondent's tugs towed her to the West Shore Dock, and, "in landing said barge at said dock, drove the stem of said barge so violently against the said dock as to cant the stem of said barge to port, and causing her serious damages. * * * Said collision occurred between 1 and 2 a. m."

Gunderson testified in rebuttal, also on deposition, April 11, 1904. He then said that when he left the Atlantic Basin, between 6 and 7 p. m., the Katie was the only craft the tug had in tow, and he turned in about Governor's Island. Could not say whether, on the way up, they stopped at Pier 4, or not, but when he next came out of the cabin they were at Thirty-Second street, where the Katie was being landed, the tug on her port side, and no other barge, canal boat, or vessel in tow of the same tug. He said: "I am not going to take my oath that she landed there. She positively landed there for orders, and that is all I can say." He would not swear that she stayed there (at Thirty-Second street. He no longer asserted a landing at Thirty-Ninth street) more than half an hour, because he turned in again very quick, and went to sleep, not hearing anything till the shock that upset the lamp, etc. That when he came out there the tug which was landing him at the West Shore had no other craft in tow; the tug was not made fast to any boat but the Katie.

Despite the variances and contradictions in his testimony, and the evidence as to conflicting statements made by him, there would be enough in it, if it stood alone, to warrant the conclusion that the injury which the barge received that night was due to mishandling by one of respondent's tugs. But there is proof in the case of such a character as to cast still more discredit upon Gunderson's narrative. The respondent operates a large number of tugs, and has very many barges and similar boats, owned or chartered as the Katie was, which it is constantly towing. Naturally so large a busi-

ness has to be conducted under an organized system. Orders are sent from the office of the chief tug dispatcher to the captains of the different tugs, directing each one to go at such a time to such or such piers, there to take in tow designated boats and move them to designated places. Each day there is turned in to the office the written report of the tugboat captain, giving a brief statement of the movements of his tug in execution of the orders received. These reports or daily logs are filed. The various men in charge of the docks controlled by respondent also send in reports of the arrival and departure of boats from their respective docks. One report is a check on the other. If a captain should report that he took a tow from one pier at 9 a. m. and landed it at another pier at 10 a. m., the dock reports, showing that he called at the first pier at 2 p. m. and reached the second pier at 5 p. m., would be likely to get him into trouble. Of course, any narrative he might insert in his report as to the circumstances of any accident which may have occurred would be of little weight, being colored, presumably, to excuse himself; but as contemporary records merely of movements from place to place, recorded without any idea that such a recital has any bearing on catastrophes occurring at some other time or place, they are, when properly authenticated, highly persuasive. These records were put in evidence—the blotter showing the orders given to the tugs, and the daily logs showing the captains' reports of what they had done in response to such orders. This is what they show: Tug 13 reported at Pier 4, East river (one of respondent's piers), for orders, at 5:40 p. m. January 27th. She was ordered to bring the Katie from Pinto's Stores, Atlantic Basin, and the barge Tivoli from South Central Pier, to Pier 4, East River. The record shows that she arrived back at Pier 4 with both barges at 6:50 p. m. The captain of Tug 13 corroborated this statement; remembering the circumstance that he had to wait for the captain of the Tivoli to come back from up the street, so that he was on the eve of leaving there and coming away and picking up the Katie alone, when the barge captain came along. Orders were then given to Tug 3 to take from Pier 4 the barges Katie and Rochester to West Shore, and the barge Tivoli to 65, North river. The report of No. 3 shows that she left Pier 4 at 7:05 p. m. with the three barges, that she landed the Katie and Rochester at West Shore at 8:25 p. m., and the Tivoli at 65 at 8:50 p. m. Taylor, captain of Tug 3, verified his report, and testified that he had the Rochester on his starboard side, with the Katie outside of her, and the Tivoli on his port side; that he landed the two at West Shore between 8 and 9 p. m., still fastened together—the Katie's starboard side to the dock —and then took the Tivoli across the river to 65. The report of the West Shore Dock dispatcher showed that the Katie arrived there at 8:25 p. m. The report from the piers Thirty-First to Thirty-Third street does not show any landing of the Katie there that night, and the dispatcher at Thirty-Third street testified to the same effect. The records show that Tug 12 picked up the Katie at West Shore at 11:45 the next morning, as to which and the subsequent transactions there is no dispute.

Upon this evidence we are satisfied that the story of the captain of the Katie that she was removed from a pier at Thirty-Ninth or Thirty-Third or Thirty-Second street after midnight, and then brought to the West Shore Pier, is wholly inaccurate. It is suggested, however, that she may have sustained her injuries when she was landed there at 8:25 p. m. Taylor, the captain, who landed her, and his mate (about the admissibility of whose testimony there is some controversy), both testify that they landed her carefully, but it is not necessary to discuss their testimony. There is conclusive proof that the Katie was not injured by having her bow driven forcibly against the pier. Every one agrees that she was landed with her starboard side to the dock, and a violent contact with it would have driven her stem from starboard to port. This is what Gunderson says was the condition of things, but his testimony, in view of its many inconsistencies, has little weight. Shewan, the shipwright and dry dock owner at whose place she was repaired, says that the heel of the stem was slewed over from starboard to port. But his attention was called rather to the extent of her injuries and the repairs required than to the direction in which the stem was displaced. He says he "didn't examine the stem very carefully." On the other hand, the three surveyors, one representing the owner, one the underwriter, and one the respondent, who examined her with the express purpose of ascertaining what had happened (two of them were called for libelant), all agree in the positive assertion that her stem was knocked over from port to starboard. In view of this testimony, we cannot escape from the conclusion that she sustained her injuries while she was tied up at the dock, some time during the night, and at the hour, whenever it was, that the shock overturned the lamp and waked her captain, and that the injuries were inflicted by some blow on her port bow, delivered by some moving vessel. But there is not enough in the record to show that a tug of the respondent's inflicted such blow. The West Shore Piers are in the control of respondent, and its tugs are constantly taking vessels to and from them, but the waters of the adjacent slips are not so shut off from general navigation that it must be assumed that all vessels found to be moving within them are to be held to be the respondent's tugs or tows. The slips are navigable waters, and, of course, free for any one to enter and depart from, using proper care. The assistant dispatcher at those piers testified that, "according to what barges are in there and what they bring there," outside tugs, not owned or chartered by respondent, do occasionally enter the slips. It seems clear on the proof that the damage to libelant's craft was not caused by the three tugs of respondent which are shown to have handled her that night and morning. Possibly some other of respondent's tugs may have collided with her while she lay tied up to the pier. Possibly some tug came between midnight and 2 o'clock (which is the time Gunderson fixes) to remove the Rochester, which was left at 8:25 p. m. lashed to the Katie's port side, and in doing so carelessly drove the Rochester against the Katie. But no one is called from the Rochester to tell what happened when she was moved, nor is there any

"order" or "daily log" or "dock report" of respondent put in evidence, showing what tug moved her and when, or whether she was merely warped by her own lines further down the pier. We have not overlooked the circumstance that Gunderson says he recognized a man on the tug as one whom he knew to have been in the employ of the New York Central Railroad, but he was referring to the tug which landed him at West Shore. In the absence of any evidence tending to show even the presence of one of respondent's tugs in the vicinity of the Katie at the time she was injured, we cannot find that respondent is responsible for the damage merely because the Katie lay at one of respondent's piers, and was under charter to respondent at the time.

The decree is reversed, with costs, and instructions to dismiss the libel, with costs.