SWENSON v. SNARE & TRIEST CO.

(District Court, S. D. New York. March 20, 1906.)

1. BAILMENT—LIABILITY OF BAILEE—EVIDENCE OF NEGLIGENCE.
   While there must be sufficient evidence to warrant a finding of negligence to fix liability on a bailee, such evidence may be supplied by presumption, and such presumption arises against a bailee for hire, where it appears that the subject of the bailment was injured or destroyed while in his custody by an accident such as in the ordinary course of things does not happen when due care is exercised.
   [Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Bailment, § 124.]

2. SHIPPING—CHARTERER OF PILE DRIVER—LIABILITY FOR LOSS BY CAPSIZING.
   The capsizing of a pile driver while being towed by respondent company to which it had been chartered, held, under the evidence, not due to unseaworthiness, but to improper towing in turning it too suddenly, which rendered respondent liable for the damages.

In Admiralty.

Hyland & Zabriskie, for libellant.
Hector M. Hitchings, for respondent.

ADAMS, District Judge. This action was brought by Johan Swenson against the Snare & Triest Company to recover the damages incident to the sinking of a pile driver belonging to him and chartered to the respondent, in the East River on the night of the 30th of July, 1905, while being towed from Flushing to Manhattan; also to recover $48 for 8 days hire of the vessel under the contract. There is no dispute about the hire being due, but the claim for damages is resisted because it is alleged that the sinking was not caused by any negligence on the part of the respondent but was due to the unseaworthiness of the vessel.

The pile driver was from 50 to 60 feet long, 23 feet wide and 4 or 5 feet deep. It is shown by the libellant's testimony that he bought her in 1901, but it does not appear at what price. She had been lying on the mud flats of South Cove, New Jersey, for several months or a year before the purchase. The libellant said she was old at the time, half of the machinery had been stolen from her and the water stood in her. He said that he repaired her, however, thoroughly, giving her everything that was needed, spending about $2,000 on her, and in 1905, spent about $850 more, and she was then in good condition. It appears that after the repairs, she was hired out and worked satisfactorily. The hirers have testified that in 1903 and 1904, the vessel was in good condition and that she worked at Kings Bridge from November, 1904, until about the middle of February or March, 1905, and no trouble was had with her. A witness testified that he examined her a week before she was chartered to the respondent and she was then in good condition; that he had examined her on the dry dock prior to being caulked. The master of the steamtug which took her from the libellant's place for delivery to the respondent, says that she towed there safely, which tends to indicate her seaworthy condition at the time, and this is reinforced by the admitted fact that on this occasion she towed from Flushing to the place of the accident in apparently good condition. It is shown that the respondent made an examination before it took possession of her but the men who made the examination, still in the respondent's employ, was not called as a witness. A subordinate of such man was called, however, who, while admitting that his superior had reported favorably on the vessel, attempted to condemn her. The respondent was satisfied with the favorable report and took possession. After that the driver withstood towing to Flushing, did several days work and then was towed safely back as far as the Brooklyn Bridge, and up to almost the time of the accident was reported to be all right by the respondent's man on board in response to enquiries from the master of the tug.

The testimony of a majority of the crew is to the effect that the driver turned upside down at the Brooklyn Bridge and shortly afterwards seemed to blow apart from the air and her deck house and loose planks floated away and she herself sank out of sight after drifting down with the ebb tide for 15 or 20 minutes. The next day, July 31st, a diver of the Wrecking Company went to the wreck on a tug about 2 o'clock P. M. He found the ways in the river and they were fastened to and brought up and placed across the boat. He

then put on his diving suit and went down. He found the planks sticking up in every direction and the wreck in a very dilapidated state. This was no doubt true but it was probably due to the boat having been struck by navigating vessels after she was sunk. Another witness for the respondent was the subordinate in its employ above alluded to, who said that he examined the boat and found her so rotten that he could get a handful of wood by merely sticking his hand into it. It seems, however, that the respondent hired the vessel on the report of the first examiner, who was not called to testify, and it is very questionable if the testimony of the subordinate should be accepted with respect to the boat's condition. The other examiner told him, he says, that, "she looked good from the outside" but that he did not go down into the hold. It does not seem that the boat could have been in the condition described by the subordinate. He said that he reported her unsound, nevertheless she was hired. It appears to be entirely inconsistent with the boat's actual condition at the time of hiring. It is evident that a pile driver in the condition described, could not have done her work for years, as she unquestionably did, and been safely towed around New York Harbor and up the East River as far as Flushing Bay.

The dilapidated condition of the wreck, is satisfactorily accounted for by the collisions it was in with vessels, subsequent to the sinking. The wreck was seen by the master of the tug boat Valley Girl on Sunday morning, the 30th, between 9 and 10 o'clock when he noticed a Metropolitan Line steamer coming down. The tug passed both the wreck and the steamer to the westward and the master thought the steamer went to the westward also, but after passing he looked back and the driver had disappeared. He said that he did not know whether the steamer ran over it or not, but it is probable that she did. It also appeared that the ferryboat Brooklyn, running between Whitehall Street, New York, and Atlantic Avenue, Brooklyn, in going to Brooklyn on the 12:48 o'clock trip Sunday morning, struck it; also that a New York Central R. R. Co. tug struck it about 12 o'clock, causing her light to roll and tumble; also that about 3 o'clock the same morning, a tug with two carfloats in tow alongside, passed over it. All these contacts would undoubtedly have the effect of breaking up the wreck.

I do not attach much importance to the so called search for it by the police boat, relied upon by the respondent. Assuming that a diligent effort was made by her to locate the wreck, the fact of her not finding it does not weigh with the positive testimony above alluded to.

The respondent relies upon the doctrine adverted to in Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012, that a defect in a vessel which is developed without any apparent cause is presumed to have existed when the service began. The law is stated in that case as follows (page 380 of 97 U. S. [24 L. Ed. 1012]):

"Where the owner of a vessel charters her, or offers her for freight, he is bound to see that she is seaworthy and suitable for the service in which she is to be employed. If there be defects known, or not known, he is not excused. He is obliged to keep her in proper repair, unless prevented by perils of the sea or unavoidable accident. Such is the implied contract

where the contrary does not appear. Putnam v. Wood, 3 Mass. 481, 3 Am. Dec. 179; 3 Kent, Com. 205. The owner is liable for the breach of his contract, but the stipulation of seaworthiness is not so far a condition precedent that the hirer is not liable in such case for any of the charter-money. If he uses her, he must pay for the use to the extent to which it goes. 1 Pars. Adm. 265; 3 Kent, Com. supra; Abbott, Shipp. (5th Am. Edd. 340. If a defect without any apparent cause be developed, it is to be presumed it existed when the service began. Talcot v. Commercial Insurance Co., 2 Johns. (N. Y.) 124, 3 Am. Dec. 406."

If the driver sank because, as claimed by some of its witnesses from the Pratt, she suddenly developed a leak at the Bridge and went down in consequence of it, the contention would have much force.

The fact that the respondent's man in charge of the driver was drowned in the accident, deprives us of such light as his testimony might have thrown upon the matter, but it appears that he reported that she was all right just before she turned over, as she did to port. What caused the turning over; was it because she was inherently weak or because something unusual occurred? The respondent urges the former, and the libellant that it was caused by turning the driver too sharply to the starboard in order to make her destination at pier 15, on the Manhattan side. Many of the respondent's witnesses from the tug say positively that there was no such turn, or any turn until after the capsizing. At first, the libellant was not able to meet the preponderance of the testimony to such effect. The legal requirement is that there must be sufficient evidence to warrant a finding of negligence in order to fix liability upon a bailee. Blakeslee v. New York Cent. & H. R. R Co. (C. C. A.) 139 Fed. 239. The necessary evidence can, however, be supplied by presumption. It was said in The Gennessee (C. C. A.) 138 Fed. 549, 550:

"The case is a proper one for the application of the rule that a presumption of negligence arises against a bailee for hire when it appears that the subject of the bailment has been injured or destroyed while within his custody by an accident such as in the ordinary course of things does not happen when a bailee uses due care."

It was urged by the libellant that the case was within the presumption but it is not necessary to determine that because it appeared by subsequent reliable testimony, which, upon a motion made for such purpose, the libellant was permitted to introduce into the case, that the driver was turned suddenly to the starboard. It had appeared in the testimony originally taken, that in turning pile drivers, it was necessary to make a long sweep, so that both of the hawsers could be kept reasonably taut, and that turning suddenly would have a tendency to make one hawser taut and the other slack and list the pile driver to an overturning point. A part of the new evidence was given by a Mr. Myers, who was crossing the 39th Street ferry about midnight from Manhattan to Brooklyn. He said that when they were about mid river, he noticed the tug and pile driver coming down, winding for the Manhattan shore and when she had gone about 500 feet she capsized, then about opposite pier 8 or 10. A day or two afterwards when crossing the Hamilton ferry from Brooklyn, he saw the can buoy, which had been placed to mark the sunken wreck.

Another witness was the pilot of the ferryboat Brooklyn. This boat was running between Manhattan and Brooklyn. She made a trip from the Manhattan side at 12 o'clock and another at 12:24. The pilot saw nothing unusual on the 12 o'clock trip, but on the 12:24, when they had gone 300 or 400 feet he saw the tug 4 or 5 points on his starboard bow, showing her starboard light; he said that after the ferryboat went 3 or 4 lengths further, the tug swung so that he saw both lights, and the object behind her disappeared. Judging from the position of the ferryboat, the object, being the pile driver, must have been near Dimond Reef.

If the driver was turned around rather suddenly, as the new testimony indicates, the capsizing is sufficiently accounted for and it seems to be decisive of the case, because it must have resulted from improper towing by the respondent's agent and not because of any unseaworthiness of the driver. This theory of the case is much more reasonable than the respondent's claim and I feel constrained to adopt it.

There will be a decree for the libellant for the hire due and for the damages, with a reference to ascertain the amount of the latter.