BOUKER *v.* SMITH, (two cases.)

*(District Court, S. D. New York.  December 31, 1889.)*

1. TOWAGE—STRANDING—IMPRUDENT START—INCOMPETENT HELMSMAN.

The respondent hired the libelants' scows to be used in moving the Rockaway life-saving station about two and a half miles to the eastward along the beach. In coming out from the inlet into the open sea, the tug grounded on a falling tide, and could not be got off; and before the next tide the scows, with the house upon them, having been anchored in the inlet, were driven by a storm on the shore, and were lost. The start was made about 5 P. M., the water being smooth at the time; but the wind for some time previous had been to the north-east, and there were other indications of a coming storm. The tug, in coming out of the inlet, was in the immediate charge of a helmsman who was not acquainted with the handling of tugs, and had not attempted to steer her before that day. *Held* that, the navigation out of the inlet with such a tow being attended with known difficulties, and with lia bility to stranding, it was negligence in the respondent's agents to start on the eve of an approaching storm, which would prevent extricating the tow in case of stranding; that the helmsman was incompetent at the time of grounding; and that for both reasons the respondent was answerable for the loss of the scows.

2. SAME—WARRANTY OF SEAWORTHINESS OF TOW.

    In consequence of the pounding of one of the scows after they were driven ashore she sprang aleak, so as to sink in the sand, and not rise with the rising tide; thus preventing the possible extrication of the stranded boats. The scow was sufficient for navigation in ordinary weather, and for the purposes for which it was let. *Held,* that the letting imported no warranty of her sufficiency to withstand the stranding without leakage.

In Admiralty.

Libels by Dewitt C. Bouker and George A. Bouker against Francis H. Smith, for wreckage.

*Wing, Shoudy & Putnam,* for libelants.

*Moore & Wallace,* for respondent.

BROWN, J. The above libels were filed by the owners of two scows, to recover for their being wrecked through the alleged negligence of the respondent while they were let out to him and in his employ. The respondent had undertaken to remove the wooden building used as a life-saving station on Far Rockaway beach, to a point about two and a half miles to the eastward, by the use of scows, on which the building was to be placed and transported. The libelants' boats were hired for this purpose in the early part of March, 1889. At the time of the agreement it was stated that it was designed to transport the building through an inside passage; but liberty was reserved to go outside, in the open sea, if the weather were calm and the sea smooth. The two scows were accordingly sent to Far Rockaway beach by the libelants, and there delivered to the respondent. They were taken a few hundred yards up Rockaway inlet, near to the station building, and the building was moved, and put upon the two scows, and got in readiness for transportation by the afternoon of the 14th. It had been previously ascertained that the inside passage to the eastward had become so obstructed as to make it unwise to attempt that course. The respondent had previously engaged the small tug-boat Kapella to take the scows with the building in tow by a hawser. The afternoon of the 14th was mild, the wind light, and the sea smooth; but the wind was to the north-eastward, and there were signs of a storm to be expected before long. After the tow should get out of the inlet, which was only a few hundred yards in length, one or two hours would be a sufficient time to take the tow to Debbs' inlet, near its destination. The respondent's agent in charge of the work, and the officers of the life-saving station, thought it advisable to make the trip that afternoon, at high water, which was from 4 to 5 o'clock; and the tug was accordingly sent for to come from Debbs' inlet, where it had been stationed. It arrived a little before 5 P. M., and proceeded to pull the tow by a hawser out of Rockaway inlet. Before starting Capt. Jaycox vigorously protested against starting at that time, on account of the signs of a coming storm, declaring that he would take no responsibility for the result. The general opinion of the other persons present being different, the respondent's agent required him to proceed. When two-thirds out of the inlet, after rounding one of the sharp curves of the channel, in crossing the outer bar, outside of the line of

the beach, the Kapella grounded by the stem, the scows drifted past the tug, and hauled her somewhat about. But the tide was already falling, and the tug could not be got off, though she backed strong. After several vain attempts to get the scows back up the same inlet, it was found that the best that could be done was to anchor them there, and wait for the next high tide. During the night the wind increased, especially upon the flood-tide after midnight, when the scows were blown ashore, and one of them, pounding in the rising sea, began to leak. Between 1 and 2 o'clock A. M. they were abandoned by the respondent's men and those belonging to the life-saving service, who up to that time had been on board. The gale proved to be a severe one, and during the following day, in the pounding of the surf, the scows and the building upon them were broken apart. One of the scows was carried a long distance up the beach to the westward, and all proved a total loss.

The respondent was not an insurer, nor a guarantor of the safety of the scows. In letting them out for this service, the libelants took the risk of all sea perils, and of all other dangers naturally incident to that service, except in so far as they might be brought about by the negligence and want of proper care and skill of the respondent or his agent, having reference to the nature of the enterprise. For such negligence, or want of due care, the respondent would be answerable; and the question here is whether the loss is fairly attributable to such negligence, or to other causes for which the respondent is not answerable. The immediate cause of the loss was the storm. The next anterior cause was the grounding of the tug, in coming out of Rockaway inlet, in consequence of which the scows, with their burden, could not be taken to a place of safety. Had the tug not grounded, there being, as I think from the weight of evidence, plenty of water in Debbs' inlet, the trip might have been safely made before the storm came on, and before dark, provided that the tug had sufficient power to tow the scows up Debbs' inlet against the ebb-tide after reaching it. Although a doubt is suggested on this point by Capt. Jaycox, there is no very satisfactory evidence on the subject. If the tug had not sufficient power to pull the tow up against the ebb, she would be obliged to wait outside in the open sea till the next flood-tide. That would involve such an unjustifiable exposure of the tow as to make the respondent answerable for the result; because all agree that, before starting to leave Rockaway inlet, there were signs of an approaching north-east storm, and the tow was only fit for a calm sea.

Assuming, however, that the entrance to Debbs' inlet might have been safely effected before dark, but for the grounding of the tug before she got out of Rockaway inlet, the grounding of the tug becomes the *causa causans* of the loss; and the question is whether this is or is not attributable to the negligence of the employes. On this point there is considerable testimony, but it fails to show satisfactorily why the tug should have run aground if properly handled. In fair weather and a calm sea, and in a buoyed channel, stranding presumably occurs only through lack of care of some kind. The burden of proof is upon the defendant to excuse it by showing that it did not arise through any lack of care, skill, or diligence in

navigation, including, in a case like this, the preparations therefor. The channel of Rockaway inlet was narrow, shoal, and winding. Hults had marked it out by three buoys. The tug grounded on the port side of the channel, between the first and second buoys, because, as is stated, of her small power, and consequent inability to obey her helm under her slow speed, with only a few inches of water beneath the rudder, and with the great lateral strain of the hawser behind. Her helm, it is said, was hard a-port when she grounded, but she would not mind it.

I am not satisfied with this explanation, as evincing due care and skill in navigation, when the other circumstances are taken into account. The place of grounding, as marked upon diagram B, by two of the respondents' witnesses, is shown to be, not at the sharpest turn nor at the "elbow," as might be inferred from other parts of Hults' testimony, but at a point considerably beyond that turn, and beyond the first buoy below it, and after both had been safely passed, and the tug had got headed to the westward. If the cause assigned were the true one, its operation would have been perceived at the previous turn, which was not the case. The wheel, moreover, was not at the time in the hands of a person either proper or competent for the purpose; it was managed by Hults, who was wholly unacquainted with the handling of tugs, and with the Kapella, and had never tried to steer her until that day. Capt. Jaycox says he gave the helm to Hults because Hults was supposed to know the channel. Hults says Jaycox asked him to take the helm for a few minutes, while he went into the engine-room; that he did so, and that Jaycox was not in the pilot-house when the tug grounded. Others say that Jaycox was there at the time. The fact remains that the helm was in the hands of a man unacquainted with the handling and management of the tug, at a time and place that specially required all such skill and care as could be expected from the master alone. It was Jaycox's duty to keep the helm; to receive such information about the channel-way as Hults could give him; and to proceed with such caution that even touching the ground with the stem should not pin him fast. Hults says the tug was going very slowly,—slower than a slow walk; but Capt. Abrams, who was on the tug, estimates the speed at three knots, with which her fast grounding better agrees. If that was the speed, it was a very incautious rate. The fact that after a few moments the tug could not be backed off, and that only "a couple of seconds" before grounding the tug was going right, as Hults says, seems to show not only that the tug was going too fast, but that the porting of the wheel was so short a time before grounding as to give it no time to operate. If the strain of the hawser was such as to prevent the tug from duly minding her helm upon any necessary change of heading, it was but the work of a moment to ease that strain, and to enable the tug to obey her helm. If Jaycox had been at the helm, as he ought to have been, I do not think the tug would have grounded.

If, however, there was no fault in the handling of the tug, and if the grounding were regarded as unavoidable, under the complicated circumstances of the case, as the respondent claims it was, still all these com-

plications and liabilities were well known and understood beforehand. It was the respondent's duty to provide—*First*, precautions against them, so far as practicable; and, *second*, a reasonable means of escape if the grounding should occur. These dangers were no part of the libelants' risks. If the liability to ground in that inlet from such causes was real, it was negligence to start out at a time when any such grounding was certain or likely to prove fatal, through the approaching storm. The respondent should have waited for weather that would give opportunity to extricate the tow from such probable mishaps. The tug was in the employ of the respondent, hired by the day. There was no independent contract between the tug and the defendant, such as to free the latter from the legal responsibility of a principal for the acts of the tug as respects the scows which he had hired. The respondent is therefore answerable to the libelants for the loss of the scows, either for starting at an improper time, in view of the difficulties, liabilities, and mishaps naturally attending such an enterprise, or for want of proper care and skill in the navigation of the tug to avoid grounding. The alleged agreement by the libelants to insure is not sufficiently proved. Even if established, it would not meet the case; since such insurance could cover only perils of the seas, not the lack of proper care on the part of the respondent's representatives and employes.

The defense that one of the scows was weak, and unable to withstand the stranding, so as to rise with the rising tide, and be thereby carried up on the beach without much injury, cannot be sustained. A stouter boat might, perhaps, have escaped in that way. But these scows were both open to examination before they were hired, and were seen by the respondent's agent. They were not let for the purpose of going safely through a process of stranding on the beach in a north-east storm, with a house upon them, nor was there any implied warranty of their sufficiency for such a trial. There is nothing to indicate that they were not sound enough and strong enough to transport the station-house through any water and sea that the respondent expected them to encounter, or to which he had any right to expose them. They were seaworthy for such purposes, and this is the extent of the libelants' implied warranty. The condition of the scows is, of course, a material one on the question of damages. The libelants are entitled to decrees in both cases, with costs.