## ZABRISKIE et al. v. CITY OF NEW YORK.

(District Court, S. D. New York. January 31, 1908.)

SHIPPING—CONSTRUCTION OF CHARTER—LIABILITY FOR NEGLIGENCE OF MASTER.
Under an oral letting of a scow by the day, including the services of the master who was employed and paid by the owner, the master remained the agent of the owner as to all matters relating to the care of the boat, and the charterer is not liable for her injury through the master's negligence in leaving her tied up at a dock by a line which was too short, by reason of which when the tide fell she careened, filled, and sank.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 220.]

In Admiralty.

Hyland & Zabriskie, for libellants.
John J. Delany and George P. Nicholson, for respondent.

ADAMS, District Judge. The libellants, Nelson Zabriskie and Michael H. Hyland, owners of the scow Oneida, brought this action against the City of New York to recover the damages incident to the sinking of the scow while at Riker's Island, in July, 1906, with a load of city sweepings. The scow was under charter to the city at $5. per day. When taken to the Island she was at first placed alongside of a dock some distance away from a digger, located on the dock, which was to discharge her, but shortly afterwards she was moved nearer to the digger and while awaiting her turn to get under it, she sank.

The libellants' allegations are that the respondent took possession of the scow under an agreement to return her to the owners in as good condition as when received, ordinary wear and tear excepted, but failed to keep its agreement and took so little care of the scow that she was returned to the libellants in a damaged condition, not caused by ordinary wear and tear. The respondent admits that it hired the scow but alleges that under the agreement the libellants were to furnish and did furnish the captain and equipment of the scow; that the libellants' own captain was in charge of the scow and was supposed to guard the boat

at all times; that if any injuries were suffered by the boat, they were caused by the neglect of the captain in failing to look after the boat and that she did not suffer any damages through the use by the respondent other than ordinary wear and tear.

It appears that the boat was in good condition when the accident happened and that her injuries resulted from the sinking. The cause of the sinking has been the subject of a warm controversy, the libellants claiming that it was due to an uneven bottom at the place where she was taken for discharge, of which the libellants were not required to take notice by sounding, while the respondent claims it was solely the result of the negligence of the master of the boat in leaving her for the night without having taken proper precautions with respect to her forward mooring line and she consequently hung herself so that water came over her side and filled her.

The relations of the master to the boat and the parties do not appear in the testimony, the latter doubtless proceeding upon the assumption, that the court would take notice that this was a usual form of oral letting for boats of this character, where the hire covers the master's wages. I believe it is understood in such cases that the master, although under the orders of the charterer as to the vessel's employment, being appointed, paid, and subject to dismissal by the owner, remains his agent in matters relating to the care of the boat. Many decisions have been made by this court upon such an assumption. It would seemingly be anomalous, if in such cases the master should be deemed the charterer's agent the same as if selected and employed by him to care for a bare boat, under the principle of chartering known as locatio navis. The kind of chartering in this case more properly falls under the 2d class of chartering, which constitutes a demise of the vessel fit for mercantile adventure, including in a case of this kind, a master. The 3d class is a contract for the carriage of the merchant's goods in the owner's ship and by his servants. It is said in Abbott on Shipping (14th Ed.) pp. 60, 61, 63, 64, 75:

"Contracts between shipowners and merchants for the hire of ships, have been divided into three classes, namely: (I.) Locatio navis, a demise of the ship itself, with its furniture and apparel; (II.) Locatio navis et operarum magistri et nauticorum, a demise of the ship in a state fit for mercantile adventure, including a master and crew; and (III.) Locatio operis vehendarum mercium, a contract for the carriage of the merchant's goods in the owner's ship and by his servants.

Respecting the first of these classes of contracts and the liability thereunder, no difficulty is likely to arise, as the shipowner surrenders to the charterer the possession of the ship with the right to appoint master and crew, and fully control them when appointed, and the charterer alone can be made liable. In the third class of such contracts it is equally plain that the shipowner retains full control over his ship, and that the master and crew are his servants, and he is therefore liable for anything done by them in the performance of the contract of carriage. But it is in the construction of the second class that difficulties have arisen. A ship may be demised with her master and crew so that the charterer has the sole control or ordering of the whole; or she may be demised so that whilst the charterer has the right to order the lading and carrying of cargo and other matters, the general control of the ship, her master and crew, remain in the shipowner; or it may be that the contract, although purporting to demise the ship with her master and crew, appears by its other provisions to be intended only as a contract for the carriage of the charterer's goods as in Class III.

There have been many varying decisions dealing with the construction of such charter-parties and the liability of owners under the same. In the earlier cases there was a tendency to hold that if there were technical words of demise, this was enough to transfer the possession and control, and consequently the liability to the charterer; but the later cases have established that the question whether the possession and control is transferred to the charterer must be determined by the intention of the parties as expressed by the wording of the contract as a whole. From the cases it appears to result that if the charterer by the terms of the contract gets the absolute possession and control of the ship, so that in the performance thereof the master and crew are acting as his servants, and not as the servants of the shipowner, the latter is not liable for their acts; but that if the control of the ship or of the master and crew remain, even partly, in the shipowner, the latter will be liable, at any rate, for anything done by them as his servants, or where they act, so that the person injured has the right to assume that they are so acting."

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"The foregoing cases illustrate what does and what does not amount to locatio navis, or demise of the ship with its furniture and apparel. Between this class of contract and locatio navis et operarum magistri et nauticorum, or demise of the ship in a state fit for mercantile adventure, comes a class which is not wholly within either one or the other, but something between the two; it is the letting of more than a ship, but of something less than a ship in a state fit for mercantile adventure. Such is a charter where the owner provides the ship and crew but allows the charterer to appoint his own master. To find out whether the master is the servant of the owner or of the charterer, or whether he is to a certain extent the servant of both, depends on the variety of circumstances, for which it is necessary to look to the particular charter."

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"When it is desired to find out whether the owner is the employer of the master and crew, or any of them, the primary questions seem to be, Who pays them? Who appointed them? Who can dismiss them? The last being, perhaps, the most important of the three. A master and crew appointed by the owner, but paid by the charterer, were held to be the owner's servants, and the owner to be liable for their negligence. A master appointed by, and under the control of, the owners, but paid by the charterer, was thought by Sir Robert Phillimore to have rendered the owners liable on contracts for necessaries. And in the case of The Beeswing, decided by the Court of Appeal in 1885, it was held that a master appointed by charterers, but whom the owners had contracted to maintain, and therefore to pay, and who was subject to the owners' orders as to navigation, and to be dismissed by them, was their servant. A similar view has been taken in America. Mr. Parsons, in his treatise on The Law of Shipping, thus deduces the law from American as well as English decisions: 'It seems, however, to be generally the rule that the party that mans the vessel is to be considered as in possession. But this may be rebutted by clear evidence to the contrary. If one party appoints the captain, and the other pays him, he is generally considered as holding the possession of the vessel for the party appointing him.' This was written in 1869, and is in accordance with English decisions up to that time; it is now supplemented by the decision in The Beeswing, which seems to show that where the original appointment is in one person, and the power of dismissal in another, the control rests with the latter."

See, also, Quinn v. Complete Electric Const. Co. (C. C.) 46 Fed. 506. This case is distinguishable from the doctrine of Swenson v. Snare & Triest Co. (D. C.) 145 Fed. 727, cited by the libellants, by the fact that the injury to the hired property there was found to be due to improper towing by the respondent. It does not cover this case, and the same may be said of other cases cited where the injury was caused by the respondent's servants.

Considering, therefore, that the master of the boat was the libellants' agent, it remains to be ascertained in what manner the accident

happened. The scow was first taken alongside of the Citizen, another boat of the same character lying at the dock about 200 feet below the place of the injury. The scow remained there for about 3 days and was then pulled toward the digger with the latter's lines until the scow was distant about 40 feet, where she was to remain until the space under the digger, then occupied by another boat, was vacated. This was about 5 o'clock in the afternoon. She was left in charge of her master who made her starboard side fast to the dock with a line at the bow and another at the stern. The length of and what was done with the bow line were subjects of this controversy. The line was a comparatively new one, about 5 or 5½ inches in circumference.

About 8 o'clock that night, the master left his boat and went to spend the night upon the Citizen, in order, as he stated, to avoid the disagreeable odor on his boat from the cargo. As both boats, however, were in the same kind of business and those on board probably suffered from the same kind of smell, it is difficult to understand how he could expect to find the Citizen more comfortable in such respect than his own boat and the fact doubtless is that he went to secure companionship and social entertainment. He returned to his boat the next morning, when he found her under water excepting the starboard side of the bow, where he said there were only 3 feet of water but increasing to 15 feet at the stern. He also said that on the port side he could not reach bottom with a pole 20 feet long. The lowest stage of the tide was probably about 2 o'clock in the morning.

The libellant Hyland appeared as a witness. He, as well as the master, said that the river where the bow of the boat was was quite shallow at low tide. The master said that he took measurements of the soundings which his proctor wrote down. Mr. Hyland also said he took a written memorandum of the measurements he made. These papers were called for by the respondent but not produced, it being claimed that they were lost.

Opposed to the claim of an insufficient depth of water at the place was the testimony of several witnesses. Carlsen, the first witness called by the libellants, said that he saw the Oneida careened over and had been in the place many times with his boat, which drew 8 feet loaded, through the low tide and nothing happened to her. Hoefling, dump inspector at the island, said it was a customary place for boats to tie up before going under the digger and he had known of boats drawing 9 feet to lie there without accident; that this case was the first he had heard of occurring at that spot. Corcoran, the master of a city scow, drawing 6½ feet of water, said he had remained there numerous times with his boat, through all stages of the tide, without injury. Baker, the master of a city scow, said she was 110 feet long and drew 9 feet of water; that he knew the location where the Oneida was sunk; that he had seen other scows lying in the same place and had been moored there with his boat at all stages of the tide; that he judged there was a depth of 8 feet there at the lowest tide and his boat might have touched bottom but never suffered any inconvenience. Golden, also a scow master, said his boat was 100 feet long and drew 8 feet 6 inches; that he had occupied the same berth with his boat

and seen others do it every day; that he had never seen a boat sunk at the place or in any difficulty.

The great preponderance of the testimony is in favor of the City's contention and I conclude that the berth where the Oneida received her damages was a safe and proper one for a boat of her character to occupy.

This conclusion only leaves for determination the question of the manner in which the boat received the injury which caused her to sink. The libellants vigorously contend that it was impossible for the line to have held the boat so that she would take in water enough to carry her to the bottom because the line by which she was fastened would not have been of sufficient strength to hold her. Assuming that it is the fact that if there had been quite a depth at the place and that the line would have broken, or the bitt to which it was fastened pulled out, from the strain, especially considering the entrance of considerable water into her hold, it appears that the line was not subjected to the stress of holding the entire weight of the boat as she was resting on the bottom and sustained by it. The libellants' testimony in this connection consisted principally of a Mr. Cahill, a shipwright, with admittedly no experience which would entitle his opinion to much weight He testified in conformity with the libellants' contention but his opinion is of little value. The master's claim was that he put out 15 or 20 feet of line forward running from the middle bitts on his boat to a pile on the dock and there was enough slack to allow for the fall of the tide. Hoefling said that when he saw the boat sunk the next morning, the line was tight between her starboard corner bitt, so tight that it was—

"as stiff as a crowbar. I carried a hickory stick with me to stir up the rats, and I hit this line to see whether it was taut and I could not make any impression; I even tried to slide on it, but I could not make any impression. Q. How did that line run up from the boat? A. Straight up and down; right to the pile. Q. Was the line short or long? A. Very short line. Q. Could you say about how long it was? A. I should say six or seven feet; eight feet."

Corcoran said she hung herself with the bow line and he remarked at the time "There is the line that done the trick." On cross-examination he said:

"When you were there with your boat was she lying on the bottom? A. No sir, never did. Q. How do you account for this boat lying on the bottom? A. The lines were too tight, and she hung herself, and her port hatch was open and as the tide was falling, of course she listed over, and I suppose the seas washed in and went through the hatch. * * * Q. Ten feet of water in all stages of the tide how could she get on the bottom by hanging herself; if she hung herself that would keep her up? A. She listed over, and her port hatches filled in with water, and she settled on the bottom and laid there. Q. What part of her was on the bottom? A. All of it. Q. How could she get on the bottom if she hung herself; the hanging would keep her up, wouldn't it? A. That is what we call hanging herself when the line is too tight and she turns around and gets a list, and fills with water and settles down."

Baker said he saw the bow line straight up and down taut; that the line should have had more slack. Golden also said that the bow line in the morning, a little after six o'clock, was straight up and down

and very taut; that he saw the master of the scow slack the line off about a quarter after eight o'clock.

The testimony with respect to the line is convincing that it was tight and held the boat's bow up at the starboard corner.

The bottom of the river was irregular at the dock and declined so as to make a greater depth a short distance away but this was not in any way the cause of the sinking, which resulted from a too tight line and the neglect of the master to lengthen it with the falling of the tide.

The libel is dismissed.