### BARTLEY v. BOROUGH DEVELOPMENT CO.

(District Court, E. D. New York. April 13, 1914.)

1. SHIPPING (§ 54*)—HIRING OF BARGE—LIABILITY FOR INJURY.
   The hirer of a barge is exonerated from the duty of returning her in as good condition as when received, where her injury results from her unseaworthiness for the service for which she was let.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

2. SHIPPING (§ 54*)—CHARTER—SURVEY OF INJURED VESSEL.
   Surveyors taking part in the survey of a vessel claimed to have been injured by a charterer should make a definite statement in their report of the damages they attribute to the specific injury which is known to them to be, or is evidently, under scrutiny.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

3. SHIPPING (§ 58*)—CHARTER—LIABILITY FOR INJURY TO VESSEL.
   Where a boat under charter, with an express or implied warranty of seaworthiness, receives an injury of which her unseaworthiness would be a sufficient producing cause, and no other cause is shown, a presumption arises that she was not seaworthy, which must be overcome before the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

owner can recover from the charterer for the injury. On the other hand, if the charterer is a bailee for hire, and under the duty of returning the boat in good condition, the burden rests upon him to explain his default, and the owner may rest on the burden of evidence thus thrown on the bailee; but if both parties offer testimony, not only as to the cause of injury, but as to their own compliance with their duty under the charter and under general rules of law, the finding of facts on the testimony will not only dispose of the question of the burden of proof, but will also determine responsibility for the injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244, 314, 327; Dec. Dig. § 58.*]

4. SHIPPING (§ 54*)—CHARTER—LIABILITY FOR INJURY TO VESSEL.

Where a boat has been chartered without a captain or master, the bailee in possession is in entire control and responsible for her handling, and the presence of a master furnished by the owner makes no difference, in case of an injury resulting from matters under the control of the charterer; but if the master was performing some duty, admittedly that of the owner, such as handling lines, pumping, watching, or caring for her in a manner made necessary by past experience, or limiting the load because of any peculiarity in structure or capacity of the boat, and if these are not matters which would be learned by reasonable care and observation, or the ordinary requirements which the bailee should take into account, then the act of the master would not be that of a servant of the bailee.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

5. SHIPPING (§ 58*)—CHARTER—LIABILITY FOR INJURY TO VESSEL.

Libelant chartered a scow with her captain to respondent, to be used in carrying earth or refuse at a stated hire per day. She was loaded at respondent's dump in the usual manner with earth dumped from carts. No negligence in loading was shown, nor was she overloaded, but the load being received faster than it could be trimmed caused the boat to list, and by reason of the listing she became strained and developed leaks so that repairs were necessary. Other boats were loaded in the same way without injury. *Held*, on such evidence, that there was a presumption and proof that the injury was due to her unseaworthiness and that her owner could not recover therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244, 314, 327; Dec. Dig. § 58.*]

6. SHIPPING (§ 54*)—CHARTER—LIABILITY OF CHARTERER.

If the proper use of a boat for the purpose for which she was hired developed weaknesses, which needed repair before she could be sufficiently strong to undergo such use, the mere fact that the weakness developed during the time she was in the possession of the charterer does not throw upon him the obligation to make the repairs and to turn back a sound boat.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

In Admiralty. Suit by William S. Bartley, as owner of the scow Bartley Brothers, against the Borough Development Company. Decree for respondent.

Foley & Martin, of New York City, for libelant.
Edward M. Grout and Paul Grout, both of New York City (Mark Ash, of New York City, of counsel), for respondent.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CHATFIELD, District Judge. The Bartley Brothers is a log-sided scow, 100 feet by 30, with sides 9 feet high. She was built about 1901, apparently in first-class manner, and was kept in repair. She was overhauled and caulked in the year 1909, and about the 1st day of March, 1910, was chartered with her captain to the Borough Development Company, by Mr. Bartley, whose father was the president of the company which owned the boat.

The terms of this charter are stated to have been that she was to be loaded in deep water (that is, at the Twenty-Seventh Street or Harrison Street dumps of the respondent), was to be returned in good condition, and a compensation of $6 per day was to be paid therefor.

The next day a telephone message was received, and the boat, which was then at the Long Dock, was towed to Gowanus Canal and taken to the Third Street dump of the Borough Development Company. She had been at the Long Dock for something like a week, and a new captain was placed on board of her the day that she was chartered to the Borough Development Company. She arrived at the Third Street dump upon the afternoon of March 2d, and, according to the records of this company and the testimony of its employés, was not placed under the dump until the following forenoon. They state that she was taken into a position to be loaded at half past 10, and loading continued until half past 11. A message was then sent to the office of the company that she had been taken out from the dump, because her captain reported that she was leaking. She was again placed under the dump at 2:30 and loaded until 3:30, when she was again taken leaking from the dump, and at 4:15 this condition was reported by the superintendent of the dump to the office of the Borough Development Company. A tug was sent to pump the boat out. Subsequently she was moved some 200 feet alongside the adjoining dock, and workmen 8 to 10 in number were set to work trimming the load, while 4 or 5 men removed some 8 or 10 cubic yards of material from the center of the boat to another scow. Hand pumps were procured from the vicinity, the boat was pumped out, repairs were made to the leaks by nailing cleats (strips of what was said to be fire wood or pieces of boxes then upon the boat) over the leaking seams, and the boat was left for the night. The following morning she was found to be in such condition that she could be moved or taken to the Long Dock, and from there to Yonkers, where, after a trip 9 days in length, she was unloaded, returned, and surveyed. Subsequently repairs were made and the boat put again in good condition.

The owner of the boat has sued for the amount of these repairs, alleging that the boat was improperly loaded.

It was suggested upon the trial and some of the testimony indicated that the boat had touched bottom, but the testimony as to the depth of the slip and the place of loading, as well as the testimony of the captain of the boat and those who saw her while she was in the position in which she rested while being pumped out, indicates that the boat did not rest upon the bottom in any such way as to cause the damage or the strain from which the leaks resulted.

Many disputed points appear in the testimony. The witnesses called upon each side contradict each other, and the case has developed into a difficult question of fact as to just how the damage was imparted to the boat.

The general manager of the Borough Development Company testified that he received the message that the boat was leaking before he went to lunch that day. After lunch he went down to the dock, found the boat at what is called the Pure Oil Dock (which is up the canal or to the east of the Third Street dumping board), and that he then spoke to the captain, who said the boat was "all right" and could receive more load. He then gave directions to the superintendent of the dump to finish loading the boat and went away. He did not go down to examine the hull, and estimates that she then had some 3 feet freeboard and was somewhat more than half loaded.

Later in the afternoon he received the second report that the boat was leaking, and then went to the dock, where he again found the boat near the Oil Dock. He succeeded in stepping on board, either directly from the dock or by getting upon a boat lying at the end of the Bartley Brothers. On this visit he went down into the hold. He found the boat listed, some water, sufficient to cover the keelson and at one point some 3 inches over the keelson, so that he wet his feet when stepping upon the keelson, and the captain and the superintendent or runner for Bartley Brothers were making repairs by nailing strips of board over the leaks after having placed oakum in the seams.

Mr. Bartley arrived while this witness was upon the boat and men were directed to trim the boat so as to correct the list. Also, upon Mr. Bartley's suggestion, certain of the material was removed. The boat was pumped out by hand, and during this time the tug which had been sent to do the pumping came but did not attempt, or at least succeed, in doing any pumping. This witness, Mr. Van Etten, was said to be the man with whom Mr. Bartley had made the charter for the boat, but this he denies, and Mr. De Wilde, the clerk who kept the record for the Borough Development Company, testifies that the conversation as to the chartering of the boat was with him. Mr. De Wilde testifies positively that he received a message that the boat was leaking, before noon, and that he received a further message in the afternoon that the boat had been taken out a second time from under the dump because of her leaky condition.

The superintendent at the dump testified that the captain reported to him in the forenoon that the boat was leaking; that the carts which deposited the load upon the boat drove up on the dumping board by a ramp on which but one line of carts could pass to, and but one line of carts pass off, the board. There was at times a continuous line of carts going up and coming down from the street to the board. The board itself was 77 feet long and about 30 feet wide. It was so constructed that it had an overhang of some 14 feet, and the carts were backed up, one alongside of the other, in turn. The material thus dumped over the face of the dump, from the back of the cart, would fall a little to the outside of the center of the boat.

This witness testifies that a depth of 9 feet at the inner side of the berth, increasing to a depth of 16 or 18 feet some 30 feet out, extended along the whole face of the dump, and that no dredging was done throughout this period, but that many boats as large as the Bartley Brothers came in and out, and that no one of them, in any way, found trouble through lack of depth of water, or from any obstruction while they were under the dumping board.

[1] It is admitted by the Borough Development Company that their plan was to load all the boats in deep water. No attention was paid to the provision of that nature in the charter, and they intended to return the boat in as good condition as they received her, unless she proved to be unseaworthy, a breach of warranty that would relieve them if the boat proved to be unable to properly perform the duties for which she was chartered. The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130; The Joseph W. Fordney (D. C.) 193 Fed. 520; ·United States Metals Refining Co. v. Jacobus, 205 Fed. 896, 124 C. C. A. 209.

The captain of the barge testified that the boat was actually placed under the dump and received some load upon the preceding afternoon at a late hour. He testifies that upon the morning of March 3d she was taken under the dump early, between 7 and 8 o'clock, and was loaded continuously until 11:30. He then, not knowing where the boat was to be unloaded and what service was to be required of her, thought that she had a sufficient load, inasmuch as the material which was placed upon her was heavy, that is, dirt rather than street sweepings or light ashes, and that he told the superintendent that he wished no more load, using the phrase, "I have enough." He actually hauled the boat out from under the dump, and remained at the point to which he hauled the boat until afternoon, when at about 2:30 he was again taken under the dump, more material was placed on board, and, he says, about 100 carts came so rapidly that he could not haul the boat back and forth so as to distribute the load, which in consequence was piled in the center of the boat, in such a way that its trim was disturbed, causing a list outboard or to port, and also causing a heap of material in the center of the boat, which he estimates at some 5 or 6 feet in height. He is corroborated to a certain extent, as to the way in which the load was piled, by the testimony of Mr. Van Etten, who says that there was a pile of dirt in the center of the boat some 5 or 6 feet in height, and that the boat had a list to port so that she had a freeboard of but 4 inches on the outside and some 2 feet on the inside.

This testimony does not differ greatly from that of Mr. Bartley, the president of the company, who arrived there between 5 and 6 in the afternoon, and who says that he found the boat with a freeboard, on the outside, of about a foot, and on the inside of from 3 to 4 feet; but his statement is that the pile of dirt in the center of the boat was much greater in extent than as stated by Mr. Van Etten. Mr. Van Etten testifies that the captain of the boat and Mr. Bartley's superintendent were placing battens or pieces of wood over the leaks inside of the boat. He generally agrees as to the location of these strips with the testimony of the other witnesses, and he estimates the total

number of these strips at 6 or 7. Mr. Bartley testifies that he told Mr. Van Etten that the boat should be trimmed and that some of the material should be taken off, and Mr. Bartley also testified that the boat was in good repair, and that when at Long Dock he examined her and knew that there were no battens or pieces nailed over any leaky places when she was taken to the dump at Third street for the purpose of use by the Borough Development Company. Mr. Bartley, however, testifies that the boat was not at the Pure Oil Dock, but was further down the Gowanus Canal, and that oakum was tamped into the seams before the pieces were nailed on. The captain of the boat testified that the tug tried to pump that afternoon, and that the next day a tug came and pumped him out. He also testified that at noon, while the boat was lying alongside the Pure Oil Dock, after he had hauled her out from under the dump, a tug came along and refused to take her away because she did not have enough load on board. This is denied by all the witnesses for the Borough Development Company, but does not seem to be conclusive, for the boat was taken back to receive more load, and it is not shown definitely that no tugboat was there, although the general statement is made that no tug to take the boat away was in the vicinity during the day.

One of the witnesses, who was called a "runner" or general man, working for Mr. Bartley, testified that he also went to the boat around 5 o'clock in the afternoon, that he found her listed over and twisted, leaking badly and with her seams open, that she had an overload of dirt, and that there was a high pile of dirt in the middle of the boat. He helped the captain caulk the seams and nail on the pieces, and also helped him pump, and remained with the boat, so as to assist with the pumping, after the others went away.

Suit was not brought upon this claim for some year and a half after the accident, and the statements of the witnesses are all made at a time so long after the occurrence that inaccuracies of recollection could easily occur, and must be considered with that in view, in so far as they contradict one another.

According to the records of the company, 350 truck loads of earth were dumped from this board on the 2d of March, while upon the 3d of March 445 truck loads of earth were dumped from this board. An accurate account of these dumpings and of the movements of the boats, and also of the time in which the boats were receiving the material, is kept and entered upon sheets which were produced in court by Mr. De Wilde; the reports being made over the telephone to him by the men at the dump.

The captain of the Bartley Brothers says that he was under the dump the greater part of the day. He received 176 out of the 445 loads of material dumped during that day, and yet 100 truck loads were dumped in the short space of time between 2:30 and 3:30 o'clock. The testimony of the employés of the company is to the effect that the Bartley Brothers was under the dump but a little over an hour in the forenoon, and for just about an hour in the afternoon, and that during this time the 176 loads of material were placed upon her. Here again there is but little contradiction between the witnesses. Such a quantity of

earth placed upon the Bartley Brothers in two hours would indicate a much higher average or rate of loading for those hours than during the rest of the day, and this in a sense would corroborate the testimony of the captain as to the way in which the load was placed upon his boat. The weight of this material is estimated at from 425 to 450 tons. It is admitted that the material was dirt, and that this runs from 2,700 pounds to 3,000 pounds per cubic yard, while the other materials dumped at this board, such as street sweepings and light refuse, average but from 1,200 to 1,500 pounds per cubic yard.

Another contradiction which must be taken into account is with respect to the survey. This was made by three men who signed the survey and who found a serious injury to the scarf upon the starboard side of the boat in the chime-log or bilge-log. It appears that there was but one scarf in this log as built, while one of the surveyors who was named by the Borough Development Company testifies that there were two scarves in this timber at the time. Other leaks were found in the scarf of the side log upon the starboard side. A number of the braces were unfastened, and of the 80 foot length of bottom to the vessel, some 62 feet, or all except about 10 feet at each end, were strained so that the seams were open and recaulking was reported necessary. All of the surveyors signed the report to the effect that they were there to estimate the damage to the boat, and that she had suffered a severe strain, such that she would have to remain upon the dry dock a sufficient time to allow the boat to resume her proper position and shape after repairs were made.

One of the surveyors has testified that the boat showed a severe strain, that the injuries apparent were those resulting from such a strain, and that the boat appeared to be in good condition except with respect to the matters which were directly attributable to this strain or injury. The surveyor for the respondent, however, testifies that he went and looked at the boat a few days before he made the survey; that he then had some conversation with Mr. Bartley and told him that he could not report to the company that Mr. Bartley should be allowed anything for the injury, as these leaks were old. He testified that the strips or battens placed over the leak showed from their color and discoloration that they had been there for a long time, and that the leaks themselves showed that they were of long standing. This conversation is contradicted by Mr. Bartley, and the surveyor showed so plainly upon the stand that he was endeavoring to justify his testimony to the effect that these were old leaks, as to make it difficult to give much weight to his testimony, especially in view of the fact that the witnesses who went down in the boat on the afternoon in question testified that battens were put on at the time of the accident, and that leaks showed themselves at that time. This surveyor also signed the statement that he was there to estimate the damage, and that the boat had suffered a severe strain.

[2] It seems to the court that comment should be made upon what is often the practice of surveyors who are sent to join in the survey for the purpose of protecting the rights of their employers, and who, instead of making a definite statement of what damages they at that

time attribute to the precise injury which is either known to them or is evidently under scrutiny, make out, agree to, and sign, a list of all repairs necessary to place the boat in first class condition, and then upon the trial testify to the effect that all of the injuries were in the nature of ordinary repairs, and that they found nothing, or substantially nothing, attributable to any cause such as that which admittedly has occurred, which has been the direct reason for the survey and which has given rise to the litigation in which they are testifying. The surveyor in question is evidently an exceedingly accurate, painstaking, and careful man. He appeared upon the trial to be desirous of telling the exact truth and at the same time of giving testimony which would help the parties who employed him and who called him, and to argue, by way of his testimony, on their side of the case while arguing against the testimony of the other side. His attitude upon the trial is not open to criticism in that respect. He was employed for that purpose, and his testimony was called by the Borough Development Company. But his employment as a surveyor, and his signature to the survey at the time, should have been based upon the expectation of giving testimony, and the survey as made by him should show nothing but matters which he is willing to testify to in court, without explanation as to why he gave a different appearance to the survey, or seemed to agree with his fellow surveyors in a report which he repudiates when upon the witness stand.

Upon the foregoing state of facts, the libelant contends that the Bartley Brothers was in the possession of the respondent under a charter which made the respondent a bailee for hire and therefore bound to return the boat in good order. Swenson v. Snare & Triest Co., 160 Fed. 459, 87 C. C. A. 443; Terry & Tench Co. v. Merritt & Chapman D. & W. Co., 168 Fed. 533, 93 C. C. A. 613.

[3] In some charters an express provision "to furnish only seaworthy boats" (U. S. Metals Refining Co. v. Jacobus, 205 Fed. 896, 124 C. C. A. 209) or the implied duty in a special charter, to furnish a boat which is seaworthy for the purpose of the charter (The J. W. Fordney, supra), controls the situation in case of accident and is analogous to but greater than that creating liability against a common carrier who is negligent in using reasonable precautions to furnish seaworthy vessels and in the conduct of those vessels upon the voyage (U. S. Metals Refining Co. v. Jacobus, supra). In case of an accident under such circumstances (as under the doctrine of res ipsa loquitur), the presumption arises (in the absence of other explanation) that her condition before the accident was not in accord with the warranty, and that the boat was unseaworthy, if unseaworthiness would be a sufficient producing cause.

Where no cause of accident has been shown, except this conclusion of unseaworthiness from the fact that the accident happened, then the presumption will make out a prima facie case, which the owner must combat and which if left unexplained will carry with it, against the owner, liability for the damages received.

As has been said in Terry & Tench Co. v. Merritt & Chapman D. & W. Co., supra, the presumption of unseaworthiness frequently arises

in insurance cases, where the party relying upon the presumption has nothing to do with the accident, and where the party furnishing the boat is necessarily bound to explain, if nothing is shown but that an accident happened.

In the case, however, of a special charter, or where by express or implied provision a seaworthy boat (in the sense of being sufficient for the purpose required) is to be furnished, the responsibility for supplying a boat of that sort is a different proposition from the responsibility resting upon the bailee to exercise proper care and management of the boat and to avoid obvious or reasonably expected injury.

The bailee, having so contracted, must return the boat or explain his default. Bouker v. Smith (D. C.) 40 Fed. 839. It follows therefore that, if a bailee is in possession of the boat and an accident occurs, the libelant (owner) may offer testimony to prove actual neglect on the part of the bailee, or (if he has no evidence beyond being able to prove the terms of the charter, the possession of the bailee, and the happening of the accident) he may rest upon the burden of evidence thus thrown on the bailee to explain.

In the Terry & Tench Case, supra, the District Court held that the bailee had explained the accident and had shown that he was free from negligence or responsibility for what happened. The District Court therefore invoked the rule placing responsibility upon the person furnishing the vessel, in the case of an accident attributable only to unseaworthiness. On appeal the Circuit Court of Appeals reversed, holding, as in the Snare & Triest Company Case, supra, that the respondent or bailee in possession had failed to show that it was not negligent. In the Terry & Tench Case, however, the court made the statement:

"If the presumption of unseaworthiness exists in the case, the libelant rebutted it by its proof concerning the condition of the vessel before and after the accident." 168 Fed. 534, 93 C. C. A. 614.

It is thus apparent that if either party relies upon presumption and puts in no testimony upon the merits as to this point, the foregoing rules can be applied in comparing the questions of liability as affected by the burden of proof. But where both parties offer testimony, not only as to the cause of the accident, but as to their own compliance with their duty under the charter and under general rules of law, the situation is that presented in the Terry & Tench Case, supra, as well as in The J. W. Fordney, supra, U. S. Metals Refining Co. v. Jacobus, supra, McAllister v. Southern Pacific Co. (D. C.) 111 Fed. 938, and other decisions of the same nature; and the finding of facts upon the testimony will not only dispose of the question of the burden of proof, but will also determine responsibility for the accident, and there is no need of falling back upon a presumption, unless the entire record shows no evidence of explanation from which the court can find the cause of the accident with respect to one party or the other. If no cause of accident can be ascertained except leaking from unseaworthiness, then the presumption and the conclusions of fact are in accord, as in The Rosalie McLoughlin (D. C.) 186 Fed. 255.

In the present case the libelant has attempted to rely upon the rule requiring the bailee in possession to satisfactorily explain the accident, but has at the same time presented evidence as to the condition of the vessel and as to the circumstances attending the accident, and has made it possible to decide the question of fact upon the entire record.

The respondent contends that it has sustained the burden thrown upon it and explained the cause of the accident, by showing that it was due to nothing unless unseaworthiness, and that, further than this, it has actually proven a condition of itself showing unseaworthiness and a breach of the implied warranty on the part of the libelant.

[4] A decision as to the cause of the accident will therefore dispose of the case, and the libelant must, under these circumstances, show that the respondent was to blame for the accident and satisfactorily meet as well the charges of unseaworthiness, and upon the whole case prove his right to a decree before he can recover.

The presence of the captain or master of the scow must also be taken into account. In cases where a boat has been transferred without a captain or master, the bailee in possession is certainly in entire control of the boat. If a master goes with the boat, his presence makes no difference in the case of an accident occurring from matters under the control of the charterer. The Bombay (D. C.) 38 Fed. 512; Terry & Tench Co., supra; Zabriskie v. City of New York (D. C.) 160 Fed. 235; North Atlantic Dredging Co. v. McAllister Steamboat Co., 202 Fed. 181, 120 C. C. A. 395.

If the master was, however, performing some duty admittedly that of the owner of the boat, such as handling lines, pumping, watching, or caring for her in a manner made necessary by past experience, or limiting the load because of any peculiarity in structure or capacity of the boat, and if these are not matters which would be learned by reasonable care and observation, or the ordinary requirements which the bailee should take into account, then the act of the master (captain) of the vessel would not be that of a servant of the bailee. Zabriskie v. City of New York, supra.

[5] In the present case the captain was on board to handle the lines and look after the boat, in the way of pumping, etc. He had to trim the load and to care for the boat while she was being placed under the dump and loaded. His acts in these respects and his manner of performing the obvious duties, as well as the giving of information about the boat, were matters as to which the bailee could call upon the captain, and in some of which the bailee made the captain his own representative in doing the work. But when the question of observing old leaks or recollecting former acts of misbehavior on the boat's part were concerned, then the captain would not be acting for the boat with respect to any matter which the bailee could know or would be expected to learn by ordinary inquiry. The master of the vessel would still bear some responsibility for the owner, and the bailee for hire might show that there was no negligence on his part or on the part of his servant, in so far as the master was acting for him.

214 F.—20

This situation applies to the present case. The master of the vessel went with the boat and in the performance of many ordinary duties was acting for the bailee. The bailee was bound to return the boat and to be responsible for any acts of negligence on his own part or on the part of those who were acting for him at the time. On the other hand, with respect to pumping, watching for leaks, and keeping in mind the prior history of the vessel, or the previous load-carrying capacity of the vessel, the master was bound to represent the owner of the boat, or the libelant, and to give information of any hidden defect or to call attention thereto, if the situation arose, unless it were as to a matter apparent from ordinary observation or as to which the bailee should have made inquiry and did not.

The master of the Bartley Brothers had been upon the boat but one day. The testimony shows that, when the boat was but partially loaded, he began to think that she had sufficient load, and that he had her taken from under the dump. He is also said by the other witnesses to have reported that she was leaking.

Knowing nothing about the previous history of the boat, he could only judge from what he saw, and as to these matters the Borough Development Company was bound to use the same care and observation. After the boat had been taken from the dump and her trim restored, and the leaks if they existed attended to, the boat was taken back under the dump; it being evident that she had not been loaded to her capacity, and there being nothing apparent which would prevent her taking the rest of the cargo. Upon being substantially fully loaded, she again developed weakness and was certainly in a leaky condition, which was again overcome. Some days after, the boat was repaired in accordance with the survey.

It would appear from the testimony that what happened was as follows: The trucks, coming upon the dump, side by side and succeeding each other in rapid order, deposited a substantially continuous pile of cellar dirt to the outside of the center fore and aft line of the boat. One man could not trim this load immediately. The boat, according to the testimony, acquired a list. The captain says that she was forced over until her rail was substantially awash. She was able to carry the load because none of it was dumped. The captain trimmed the boat; but the strain under this listing caused leaks, which disappeared when the boat went back to an even keel and when her port rail was raised to a proper height above the water.

This is in entire accord with the captain's testimony that something like 100 carts came and dumped their loads near the middle of the boat. It is impossible to hold that all of the carts reported by both the captain and the witnesses for the respondent dumped their loads midway between bow and stern, but they evidently did dump their loads midway near the fore and aft line, and evidently the pile was higher right at the middle of the boat between bow and stern. The boat was taken back under the dump and in the afternoon received an additional load almost as great in amount and placed on the boat in exactly the same manner. She again manifested leaks under the

necessary listing before the load could be trimmed, and water began to come in.

No amount of water is shown which of itself would cause the strain reported in the survey. Upon being righted and repairs made, the boat again closed up the seams and became tight enough to make the succeeding voyage with a small amount of pumping. This would indicate that the strain was the result of the deposit of the load of earth in such a position as to cause a list, not sufficient in amount to either dump the cargo or to overload the boat. The tide was rising throughout this whole period, and the greatest listing and straining seems to have happened when the load was substantially complete or after the tide had risen to a considerable extent.

The inconsistencies and contradictions in the testimony, whether due to failure of recollection or to the viewpoint of the witnesses, substantially disappear when we consider the actual facts of the case. The Borough Development Company has apparently sustained any burden thrown upon it to show that the accident did not happen through its own fault, or through negligence on its part as bailee in possession of the boat, and the testimony also shows that the condition of the boat and its inability to sustain the rapid receipt of a load of earth from a dump, or its liability to leak and twist when listed during the process of loading, was the real cause of the accident.

The total amount of material on the boat was not more than she could properly carry. A seaworthy boat with a load placed upon the boat from a dump (in such a manner as to cause a list, insufficient to dump the load, but sufficient to require trimming and possibly to require pumping, if ordinary leaks either above or below the load line produced a sufficient quantity of water to be removed during the time the boat was listed over) should not suffer strain and should not develop weakness making repairs necessary beyond the ordinary repairs of the usual voyage. Many scows were loaded in this way at these dumps without injury.

[6] No evidence has been introduced to show that this load was placed upon the scow in any manner other than as usual or than was contemplated when the scow was chartered for this purpose. No testimony satisfactorily shows that any extra load at one particular point was the cause of the accident. No testimony shows that the Borough Development Company was negligent in loading the boat in the usual way, and if the boat were unseaworthy or unable to stand the strain of being treated in the way for which she was provided, and if that use developed weaknesses which needed repair before she could be sufficiently strong to undergo that use, then the mere fact that the weakness developed during the time when she was in the possession of the respondent under the charter does not throw upon the respondent liability to make the repairs and to turn back a sound boat instead of one insufficient for the purpose desired.

The testimony of the witnesses receiving a report at noon that the boat was leaking and then going to the boat, where one of them testifies that he took a lantern and saw some leaks which had been repaired by the captain at that time, and the general evidence as to the

occurrences of the day in question, shows the fault to have been, not that of negligence on the part of the respondent, but rather the fault of the boat.

The proof shows that she was not in a proper condition to satisfy the implied warranty under which she was chartered, and, in so far as unseaworthiness would be presumed from the conditions shown, the libelant has not been able to prove the contrary.

A decree dismissing the libel will be entered.